NESBIT, PLAINTIFF IN ERROR, v. THE PEOPLE, DEFEND-
ANT IN ERROR.

| | |
|---|---|
| 19 | 441 |
| 20 | 283 |
| 19 | 441 |
| 21 | 46 |
| 22 | 77 |
| 19 | 441 |
| 24 | 263 |
| 19 | 441 |
| 30 | 100 |
| e31 | 401 |
| 31 | 415 |
| 31 | 418 |
| 31 | 419 |
| 31 | 425 |

1. AMENDMENTS TO CONSTITUTION.
The power of the general assembly to propose amendments to the con-
stitution is not subject to the provisions of article 5 regulating the
introduction and passage of ordinary legislative enactments.
Section 2 of article 19 prescribes the method of proposing amendments
to the constitution, and no other rule controls.
2. EXISTENCE OF CONSTITUTIONAL PROVISION.
A question of fact as to the existence or non-existence of a law (con-
stitutional or statutory) is a question of law to be determined by
the court, and not by some other tribunal, and in deciding such
question resort may be had to other evidences than the session
laws published by authority.
3. MANDATORY PROVISIONS.
Constitutional provisions are generally to be considered mandatory
rather than directory, and those regulating the mode of making
amendments to the constitution must, in general, be strictly ob-

served; but the amendments to sections 6, 19 and 22 of article 5 of the Constitution, approved in 1884, though not accurately entered in full on the journals of the two houses, are held to be valid for reasons stated in the opinion.

4. INFORMATION ACT.

The statute providing that crimes and misdemeanors may be prosecuted and punished by information based upon preliminary examination and commitment, is not contrary to any constitutional provision.

5. DISTRICT ATTORNEYS AND CLERKS—DEPUTIES.

The statutes providing that district attorneys and clerks of district courts respectively may act by deputy, are valid; and where the district court recognizes such deputies, it is to be presumed, in the absence of anything to the contrary, that such deputies were duly appointed and qualified.

6. OBJECTIONS, NOT SPECIFIC.

Where objections relate to statutes, which are in no manner cited or pointed out, either in the record proper, or in the bill of exceptions, or in the assignment of errors, or in the brief or argument of counsel, such objections, under the standing rules and practice of this court, will not be considered.

7. DEFENSE OF INSANITY.

The defense being insanity, the court upon motion of defendant with the consent of the district attorney appointed a physician to make an examination and to testify on the trial as to defendant's mental condition; held, that an examination and consultation between defendant and the physician, under such circumstances, was not confidential; and that the physician could be called by the state to testify in rebuttal, even though he had not been called by defendant.

8. NEW TRIAL—AFTER-DISCOVERED EVIDENCE.

A motion for a new trial on the ground of after-discovered evidence to be availing must show that the moving party could not with reasonable diligence have discovered the evidence in time for the former trial; and where the newly discovered evidence consists of a professional opinion as to the mental condition of defendant, the motion is insufficient unless it be shown that proper efforts were made to obtain the same before the trial.

9. JURORS—TALESMEN.

The term talesmen, in section 4 of the act of 1891 concerning jurors, includes such persons as may be summoned to supply a deficiency in the regular panel as well as persons summoned for the trial of a particular cause.

*Error to the District Court of Arapahoe County.*

UPON information filed by the district attorney, William

Nesbit, defendant below, was convicted of murder of the first degree and sentenced accordingly. He brings the cause to this court by writ of error.

### STATEMENT.

Defendant was a man upwards of fifty years of age. Mrs. Irwin, the deceased, was about forty-eight. Both were residents of the city of Denver. Mrs. Irwin lived at 2404 Larimer street, and with her sister, Miss Kate Swift, kept boarders. Defendant and Mrs. Irwin had had business dealings concerning the furniture and good will of the boarding house, and other property. These dealings culminated in a lawsuit; the cause was tried and concluded on March 31, 1893, at about 11.30 o'clock in the forenoon. Defendant was present at the trial, and so also was Mrs. Irwin, accompanied by her sister. The result of the trial was unfavorable to defendant.

After the trial Mrs. Irwin and her sister went home; and Mrs. Irwin being sick with a cold, as her sister testified, retired to bed. Defendant, also, at the close of the trial went to his room; sometime after he went into a brass foundry near his place, where he met some acquaintances and staid there awhile visiting and drinking beer. About four o'clock of the same day he went into the saloon which was under the apartments occupied by Mrs. Irwin, and there took a drink of whisky. He then went upstairs, met Miss Swift, with whom he was acquainted, and, as she testifies, said to her pleasantly, "How do you do?" Defendant asked for Mrs. Irwin. Upon being told that Mrs. Irwin was in her room asleep, he said, "I would like to see her." Miss Swift went into the bedroom where her sister was, and returning told defendant that Mrs. Irwin was in bed and could not see him. He insisted upon seeing her, saying, "I must see her." Miss Swift, went again to her sister's bedroom, and returning told defendant that Mrs. Irwin was undressed and could not see him. Defendant replied, "She need not get out of bed; I will speak to her at the door." Miss Swift testifies that she saw nothing

unusual in defendant, and so went into the kitchen near by. It appears that defendant opened the door, stepped into Mrs. Irwin's room, and said, "I have come to settle the matter with you," and thereupon drew a revolver and fired four bullets into her body.

Miss Swift testifies that, hearing the shots, she came to the door in time to see defendant fire the fourth shot, and that Mrs. Irwin was kneeling at her bedside at the time.  Defendant said to Miss Swift, "I will shoot you," and, upon her running down the back stairs, defendant went out and was arrested.  Being somewhat roughly handled by persons assisting in the arrest, defendant was excited, called names, and made use of profane language.

Defendant was placed in the police patrol wagon, and upon being searched the weapon with which he had done the shooting was found in his coat pocket.  Defendant was soon thereafter taken back to the house where Mrs. Irwin was lying wounded, and upon her identifying him as the man who had shot her, defendant said with profane expletives, "I am sorry I didn't give you more of it."  On being removed to the police station, defendant was called into the office of the chief, and being asked why he had done the shooting said again, in profane and foul language : " she cheated me, and sold me out under a mortgage.  She beat me in a trade. We had a lawsuit in the morning, and she beat me because I didn't have enough to swear.  I shot her three times.  I was not drunk."

Mrs. Irwin died as the result of her wounds the third day after the shooting.

On the defense, defendant testified that he had no recollection of the shooting, nor of anything for a few hours previous thereto.  Other witnesses for defendant testified, giving an account of his life, his business habits, conduct, characteristics, and circumstances tending to show that he was somewhat erratic, and, in their opinion, of unsound mind at times.

The state offered testimony in rebuttal of the alleged insanity of defendant, Dr. Eskridge testifying that from an

examination made by himself, as well as from the testimony stated to him in a hypothetical question, he was of the opinion the defendant was sane.

### CONSTITUTION, ART. 19.

"Sec. 2. Any amendment or amendments to this constitution may be proposed in either house of the general assembly, and if the same shall be voted for by two-thirds of all the members elected to each house, such proposed amendments, together with the ayes and noes of each house thereon, shall be entered in full on their respective journals; and the secretary of state shall cause the said amendment or amendments to be published in full in at least one newspaper in each county, (if such there be), for three months previous to the next general election for members to the general assembly; and at said election the said amendment or amendments shall be submitted to the qualified electors of the state for their approval or rejection, and such as are approved by a majority of those voting thereon shall become part of this constitution; but the general assembly shall have no power to propose amendments to more than one article of this constitution at the same session."

Mr. DANIEL PRESCOTT, for plaintiff in error.

Mr. EUGENE ENGLEY, attorney general, and Mr. H. T. SALE, for the People.

MR. JUSTICE ELLIOTT delivered the opinion of the court.

At the outset of this case we are confronted with a question of the utmost importance—a question involving the validity of certain amendments to the constitution as proposed by the general assembly in 1883. The title of the act proposing the amendments, as finally passed, was as follows: "An Act to Submit to the Qualified Electors of the State of Colorado Amendments to Sections Six (6), Nineteen (19), and

Twenty-two (22) of Article Five (5) of the Constitution of the State of Colorado, concerning Legislative Department." Session Laws 1883, p. 21.

The amendments thus proposed provided in effect:

1. That "no session of the general assembly shall exceed ninety days;" the original limit, after the first session, was forty days.

2. That "no bill, except the general appropriation bill for the expenses of the government only, introduced in either house of the general assembly after the first thirty days of the session, shall become a law;" the original limit was twenty-five days.

3. That "Every bill shall be read by title when introduced, and at length on two different days in each house;" the original section provided that, "Every bill shall be read at length on three different days in each house." For original §§ 6, 19 and 22, art. 5, see Gen. Stats. (1883), pp. 41–43; for amended sections, see Mills An. Stats. (1891), pp. 221–233.

The act under which defendant in this case was informed against and convicted was not passed by the general assembly until more than forty days after the commencement of the legislative session of 1891. See. Session Laws 1891, pp. 240, 242.

In *In re Dolph*, 17 Colo. 35, it was held that the act of 1891, *supra*, providing for criminal prosecutions by information based upon preliminary examination and commitment, as provided by section 8 of the act, was free from the constitutional objections *then* urged. See, also, *Jordan v. The People*, decided at this sitting of the court. (*Ante* 417.) But the objections *now* urged against the information act have never before been raised in this court; they strike deeper than the objections made in the *Dolph case*, or in the *Jordan case;* they deny the power of the general assembly to pass *any act* after the expiration of the first forty days of any legislative session, the ground of objection being that the constitutional amendments proposed in 1883, as above stated, were not pro-

posed as provided by the constitution, and that they are, therefore, null and void. The specific objections to the proposed amendments are thus stated by counsel:

"1. The bill submitting the amendments violates sec. 21 of art. V in that it contains more than one subject.

"2. It also violates sec. 17 of art. V in this, that during its passage through the house it was so altered and amended as to change its original purpose.

"3. During the passage of the bill it was amended materially, and the amendments were not printed as required by (original) sec. 22 of art. V.

"4. The bill fails to comply with the mandate in sec. 2 of art. XIX, requiring its entry in full on the journal of both houses.

"5. Sec. 22 is invalid for the additional reason that it is not expressed in the title actually adopted.

"Const., art. V, sec. 21."

As corollaries to the foregoing propositions, counsel states specific objections to the information act of 1891 as follows:

"1. The bill was introduced later in the session than permitted by (original) sec. 19 of art. V.

"2. The bill was not read at length on three different days in each house, as required in (original) section 22 of article V.

"3. All the proceedings in the passage of the bill, except the reading of the bill by title on its introduction, were had after the session had expired by lapse of time, under (original) sec. 6 of art. V."

Most of the foregoing objections are easily disposed of. The power of the general assembly to propose amendments to the constitution is not subject to the provisions of article 5 regulating the introduction and passage of ordinary legislative enactments. A proposed amendment to the constitution need not be restricted, like an ordinary legislative bill, to a single subject; the only restriction is, that "amendments shall not be proposed to more than one article of this constitution at the same session." Const., art. 19, sec. 2. It

is not essential that the subject of a proposed amendment shall be expressed in its title ; a proposed amendment need not have any title except as it designates the article of the constitution to be amended.   In changing a proposed amendment to the constitution during its passage through either house, it is not necessary that such change should be printed, nor that the original purpose of the proposed amendment should be strictly adhered to.   *Koehler v. Hill*, 60 Iowa, 543.

Section 2 of article 19 prescribes the method of proposing amendments to the constitution, and no other rule is prescribed.   It is not, therefore, by the "legislative" article, but by the article entitled "amendments," that the legality of the action of the general assembly in proposing amendments to the constitution is to be tested.   Article 19 is *sui generis ;* it provides for revising, altering and amending the fundamental law of the state, and is not in *pari materia* with those provisions of article 5 prescribing the method of enacting ordinary statutory laws.   The distinction is obvious. When an ordinary legislative bill, free from constitutional objection, is introduced and passed by both houses of the general assembly, as provided by article 5, it becomes, when approved by the governor (or without his approval when passed by a two-thirds vote of both houses), a valid and binding law ; thus, an act of ordinary legislation is fully and finally consummated, and thus a statutory law is brought into existence, by virtue of the power vested in the legislative department of the government.

But in proposing an amendment to the constitution, the action of the general assembly is initiatory, not final ; a change in the fundamental law cannot be fully and finally consummated by legislative power.   Before a proposed amendment can become a part of the constitution, it must receive the approval of a majority of the qualified electors of the state voting thereon at the proper general election.   When thus approved it becomes valid as part of the constitution by virtue of the sovereign power of the people constitutionally expressed.

We are aware that the practice of the general assembly of this state has been to introduce proposed amendments to the constitution by bill, and to observe in considering and disposing of such measures the usual formalities relating to ordinary legislative bills. This practice, though not essential, is, nevertheless, to be commended, since it is likely to insure greater care and deliberation in considering matters of such great importance. But, as before stated, the requirements of section 2 of article 19 are the controlling provisions to be regarded by the general assembly in proposing amendments to the constitution.

It is urged that even though constitutional amendments may be proposed otherwise than by bill, yet as the general assembly in this case undertook to propose by bill, they were bound to observe the formalities of a bill in passing the same ; and, further, that the bill in this case contained other matters which could only be provided for by a statute duly enacted. It is true, the bill in this case, in addition to the proposed amendments, contained provisions prescribing the manner of voting upon the proposed amendments, and the canvassing of the returns of such votes. These provisions may be regarded as incidental to the proposing of the amendments ; there being no general law upon the subject, it was necessary that suitable regulations governing the voting and canvassing of returns should be provided. Conceding that the regulations thus inserted gave the bill a statutory character, it was, nevertheless, unobjectionable ; as a bill for an act, it had but a single subject which was clearly expressed in the title ; both in its title, form and subject-matter, it was free from every constitutional objection ; as a bill for an ordinary legislative act, it was passed through both houses with all due formality, and was enrolled and signed by the proper officers, including the governor ; hence, as a statute, no legitimate objection has been or can be urged against it. The fact that it also contained proposed amendments to the constitution did not vitiate it as a statute, nor did its statutory character affect the validity of the proposed amendments included there-

in, since amendments may be proposed in any form or manner so long as the requirements of section 2 of article 19 are observed. The remaining objection, to the effect that the proposed amendments were not entered in full on the respective journals of the two houses of the general assembly, requires further consideration.

2. Every court must determine for itself what the law is upon a given subject whenever it becomes necessary to apply the same 'in the discharge of its judicial functions. It is a matter of every day experience that the court must decide what the common law is, and what the construction of statutes shall be; so, also, the court must decide as to the existence or validity of a statute whenever the same is in dispute; and, as a general rule, the same principle applies to a dispute respecting the existence or non-existence of constitutional provisions. Such dispute may become a question of fact, yet the court must determine it, and, in doing so, may resort to other evidences than the session laws of the state published by authority. It may seem paradoxical, but it is nevertheless true, that a question of fact respecting the existence or non-existence of a law is a question of law; it is a question to be determined by the court whenever it arises in the course of litigation, and not a question to be referred to some other tribunal for decision. *Town of Ottawa v. Perkins*, 94 U. S. 260.

The published journal of the house of representatives for the legislative session of 1883 shows that the proposed amendments to article 5 were introduced and passed by a two-thirds vote of all the members elected to that house, the ayes and noes of such vote being entered on the journal, and that the proposed amendments were also entered in full upon the journal of the house.

The published senate journal shows that the senate *undertook* to make a single change only in the proposed amendments, to wit, the words "first *seventy* days of the session," in the proposed amendment to section 19 of article 5, were

changed to read "first *thirty* days of the session." The proposed amendments were entered in full on the senate journal.

The bill being returned to the house of representatives, the journal shows that the amendment changing the word "seventy" to "thirty" was concurred in by a vote of two-thirds of all the members elected to the house; but the proposed amendment thus changed was not again entered in full upon the journal of the house.

In entering the proposed amendment on the senate journal, several discrepancies occur which perhaps should be regarded as merely clerical; for example: In the proposed amendment to section 6 the house journal contains the words, "until otherwise provided *for* by law;" in the senate journal the word *for* is left out. In the proposed amendment to section 19, the house journal uses the compound word "members-elect," while the senate journal uses the words "members elected." But there are differences of a more serious character. In the proposed amendment to section 22, the house journal reads, "Every bill shall be read by title when introduced, and at length on *the* different days in each house," while the senate journal reads, "Every bill shall be read by title when introduced, and at length on *two* different days in each house."

If, in arriving at a conclusion in this case, we were to be governed entirely by these legislative journals, it would be a serious question to determine how many days a bill should be read at length; the addition of two letters makes "three" of the word "the;" and it requires a change of two letters to make "two" of the word "the." In neither of the journals is there any record of, or reference to, the change of the word *the* to the word *two*.

In this connection the language of Mr. Justice Stone in *In re Roberts*, 5 Colo. 525, is appropriate:

"The legislative journals are required by the constitution, and for an obvious purpose certain things are required to be entered therein. They possess the character of public records, and as such are admissible as evidence of the proceed-

ings of legislative bodies, and this independently of statutory provisions. *Their value as evidence, however, is a question for the courts, and will be affected by the internal evidence which such records furnish as to the system and completeness or carelessness and slovenliness with which they have been kept.*"

The condition of the proposed amendments to article 5, as shown by the published legislative journals, fully justifies the criticisms made in the *Roberts case*, and is suggestive of the further remark that legislative bodies should be more careful in selecting competent and faithful clerks to keep the journals of their proceedings; it is especially necessary that matters of so much importance as proposed amendments to the constitution, when finally agreed to by the two houses, should be correctly entered in full, and alike, on their respective journals, as the constitution requires.

3. If the constitutional amendments now challenged were of a different nature, or if the objections to their validity had been raised at an earlier date, our conclusion might be different; but circumstances and conditions of the most vital character require that these amendments be upheld. As we shall see, their foundation ought not and cannot with safety to the public be shaken or undermined. The most cogent reasons for this conclusion are easily stated, though it is not possible to enumerate them all.

There is no question that the amendments as certified and signed by the proper officers of the two houses and by the governor, were passed by the requisite two-thirds of all the members elected to each house; thus enrolled they were deposited in the archives of the state; the secretary of state caused them to be published and submitted for approval or rejection at the general election in 1884, as required by the constitution, and they were then and there approved by a majority of the qualified electors voting thereon; these matters are in no way controverted.

Moreover, the amendments have been accepted, and acted upon by every department of the government since they were thus adopted; five regular sessions of the general assembly

have occurred during that time; and each session has continued for the full period of ninety days.   The bulk of all the statutes enacted during these five legislative sessions was passed after the expiration of the original limit of forty days. The Session Laws of 1885, 1887, 1889, 1891 and 1893 show that about ninety-five per cent of all the statutes passed during such sessions were approved more than fifty days after the commencement of the session at which they were enacted respectively; and it is safe to say that not a single legislative bill has ever been read at length on three different days in each house since the amendment went into effect requiring but two such readings.   Not only has the great bulk of ordinary legislation been passed after the expiration of forty days of these legislative sessions, but legislation of the most important and far-reaching character affecting every department of the government has been based upon these amendments.

Several other constitutional amendments have been proposed, approved and acted upon since the amendments in question were adopted, and such subsequent amendments have their inception in acts of the general assembly passed after forty days of the session had expired—notably the amendments proposed in 1885 and approved in 1886 changing the judiciary article of the constitution.   Based upon such amendments to the judiciary article the act creating the court of appeals was passed, and for nearly three years that court has exercised appellate jurisdiction in a large number of cases; so, also, by virtue of the same amendments, acts providing for more than one judge in certain judicial districts have been passed, and under such acts no less than nine additional judges have been appointed or elected, and have exercised their offices in courts of general jurisdiction for a period of time ranging from six months to nearly six years; and so, also, acts creating several new judicial districts have been passed, and judges have been appointed and elected for such districts.

Furthermore, the act increasing the membership of the

two houses of the general assembly from seventy-five to one hundred members stands upon a foundation which must fall if the amendments of 1884 are declared nullities. So, also, an entire code of civil procedure was adopted at the legislative session of 1887, more than forty days after the commencement of said session, and such code with its amendments has been the exclusive law regulating the commencement, trial and adjudication of all ordinary civil actions both at law and equity in this state since that time.

So, also, a large number of new counties have been created, organized and set in operation in different parts of the state since adoption of the amendments of 1884. These county organizations and all the operations of the government thereunder, would be in a chaotic condition if the constitutional amendments in question were to be declared nullities.

Again, the revenue article of the constitution has been amended, and millions of dollars of the public funds of the state have been appropriated and expended in pursuance of acts of the general assembly, all of which said amendments and the acts passed thereunder depend for their force and validity upon the constitutional amendments challenged in this case.

So, also, the charter of the city of Denver has been several times amended, and the boundaries of the city enlarged by virtue of legislative acts dependent for their existence upon the validity of the constitutional amendments in question. Under these several acts the most important public, private and corporate interests are involved, all of which would be jeopardized if the amendments in question were to be overthrown. The full extent of these consequences cannot be enumerated; they can scarcely be conceived of or comprehended.

We must not be understood as holding that the maxim *ab inconvenienti* suffices to sustain amendments to the constitution improperly proposed or approved. We are not unmindful of the rule that constitutional provisions are generally to be considered mandatory rather than directory. We are

aware, also, that many courts of last resort have held that
constitutional provisions providing for constitutional amend-
ments must be strictly observed in order that such amend-
ments may be upheld.

The reasons for our conclusion may be summarized thus:
Though the proposed amendments to article 5 were not cor-
rectly entered in full on the journals of the two houses as
the constitution requires, yet it is clear what the amendments
were and are; they were preserved by the enrolled bill; it
is certain that they were proposed and adopted in good faith
by the requisite number of both houses of the general assem-
bly; they were duly published and submitted by the secre-
tary of state to the qualified electors of the state for their
approval or rejection; they were duly approved by a majority
of such electors voting thereon at the proper general election;
and they have been accepted and acted upon by the different
departments of the state government for the last nine years.
By virtue of said amendments the organization and opera-
tion of the different departments of the state government
have been changed and otherwise affected in many substan-
tial respects; nearly all the statutes enacted during five reg-
ular legislative sessions depend upon the validity of said
amendments; nearly a thousand legislative acts, and more
judicial decisions and executive acts than can be enumerated,
depend upon said amendments.

To overthrow amendments thus submitted and approved
—thus accepted and acted upon—would not only paralyze
the jurisprudence of our state and affect rights and interests,
public, private and corporate, in a degree wholly irreparable,
but would disorganize the different departments of govern-
ment that have grown up under these amendments to such a
degree as to almost produce a state of anarchy. The approv-
al of these amendments by the people, and their acceptance
by the representatives of the people, have, in this instance,
practically removed the question of their validity from the
sphere of mere judicial authority to the sphere of the politi-

cal power of the state; the conditions are such that the judiciary ought not attempt to declare them void.

These amendments, and the almost innumerable acts of the different departments of the government dependent thereon, have become so interwoven into the fabric of our laws, constitutional as well as statutory, that they cannot be unraveled and separated without nullifying a multitude of legislative, executive and judicial acts, thus destroying a vast variety of rights and interests that have accrued thereunder, and seriously affecting the integrity of the government itself.

Counsel in his brief quotes from the opinion in *Collier v. Frierson*, 24 Ala. 109, the following:

"The constitution is the supreme and paramount law. The mode by which amendments are to be made under it is clearly defined. It has been said that certain acts are to be done—certain requisitions are to be observed, before a change can be effected. But to what purpose are these acts required, or these requisitions enjoined, if the legislature, or any other department of the government, can dispense with them. To do so, would be to violate the instrument which they are sworn to support; and every principle of public law and sound constitutional policy requires the courts to pronounce against every amendment which is shown not to have been made in accordance with the rules prescribed by the fundamental law."

The Alabama amendment required the general assembly to elect the state treasurer and state comptroller biennially instead of annually. We do not question the correctness of the Alabama decision; but the language of the opinion, above quoted, is too broad to be applicable in all cases.

Counsel for defendant places much reliance upon the case of *Koehler v. Hill*, *supra*. In that case, under a constitutional provision similar to ours, the Iowa supreme court held that an amendment to the constitution need not be proposed by bill; but that it must be entered in full upon the journals of the two houses; and by a divided bench declared an amend-

ment void because its entry in the house journal was different from its entry in the senate journal.

It is strongly urged that the Iowa decision should be accepted and followed as a precedent in this case.    There would be strong reason for so doing if the subject-matter of the Iowa amendment was analogous or closely analogous to the amendments under consideration.    The Iowa amendment related to the traffic in intoxicating liquors ; it was a police regulation sought to be engrafted into the constitution ; it was a regulation pertaining to matters of individual concern ; it did not pertain to, nor affect the operations of the government, or any branch thereof ; it prescribed no rule of action or of procedure for the general assembly as to the enactment of future laws, nor any limitation upon its sessions ; it did not, and could not, affect or control the lawmaking power itself in respect to the manner of enacting further laws, constitutional or statutory.

The Iowa amendment was purely negative ; it said to the people as individuals : " Thou shalt not ; " hence, if accepted and acted upon, the operations of the government would not be affected ; thus it was very different from affirmative amendments which say to the general assembly : " You may introduce bills for thirty days, instead of twenty-five ; it shall be sufficient if you read a bill on two different days, instead of three ; you may continue in session ninety days instead of forty."    The consequences resulting from accepting and acting upon amendments of the latter kind have already been sufficiently pointed out.    The Iowa case not being analogous to this, the majority opinion of that court cannot be accepted as a controlling precedent.

Intelligent and fearless judges will not become slaves to mere precedents ; servility leads to irreparable injury ; independence, intelligence and integrity are the sure safeguards against injustice.    It is well to look to precedents ; but in so looking, the facts and circumstances of the particular case must not be overlooked.    As has been said by an eminent American jurist :

"Precedents ought never to be allowed an arbitrary and unbending control of any case, not precisely analogous; we might say, not strictly identical. And while all analogies, however remote, must be, and should be, allowed to have their just and proper weight, and the more weight, in proportion to the nearness of the analogy, in determining future cases, we ought never to forget that mere analogies never rise above the character of assistants." 1 Redfield on Wills, 423.

4. The prosecution in this case was by information based upon a preliminary examination and commitment of defendant by a justice of the peace. Such mode of prosecution is not, as we have seen, contrary to any constitutional provision; besides, it is expressly authorized by statute. *In re Dolph, supra.*

5. Objection was made that the information was signed "Robert W. Steele, District Attorney, by O. W. Jackson, Deputy." The verification was made by "O. W. Jackson, Deputy District Attorney;" the jurat to the verification was signed "Matt Adams, Clerk of the District Court, by Wm. R. Marshall, Deputy."

Objection is made that the information, verification and jurat were not signed and attested by persons lawfully authorized. The act of 1891 providing for prosecutions by information contains, among other things, the following:

"Sec. 12. All matters and things required to be done by the district attorney by the provisions of this act may be done with like force and effect by his deputy." Session Laws 1891, p. 243.

It is further provided by statute that the district attorney in each judicial district of this state may appoint one or more deputies, and that such deputy or deputies, being duly qualified as the statute provides, "shall have all the powers of the district attorney." Session Laws 1885, p. 176.

Another statute provides that every clerk of a court of record may, with the approval of the judge, appoint one or more persons to act as his deputy or deputies; and that such

deputy may perform the duties of such office in the name of his principal.   Gen. Laws (1877), p. 125.

District attorneys and clerks of district courts are officers designated and provided for by the constitution; but nothing in the constitution restricts the legislature from providing that such officers may have deputies to act in their name, or stead.   In the absence of anything in this record to the contrary, we must presume that O. W. Jackson was the duly appointed and qualified deputy of Mr. Steele, and that Wm. R. Marshall was the duly appointed and qualified deputy of Mr. Adams, since the district court recognized them as such respectively in signing and verifying the information and in attesting the jurat as above stated.   Out of abundance of caution the court, before the arraignment of defendant, permitted the district attorney in person to verify the information before the clerk in person.   The precaution was unnecessary. The denial of the motion to quash the information on the grounds above stated was not error.

6. When the jury was called to try the case, a challenge to the array was interposed in behalf of defendant.   The objections urged against the impaneling of the jury were to the effect, that not all the jurors were drawn from the jury box containing the list certified by the county commissioners, as provided by statute, and that some of them were summoned by open venire issued and served by orders of the court. These objections are not presented by counsel in this court in such manner as to require consideration.   Neither in the record proper, nor in the challenge, nor in the bill of exceptions, nor in the assignment of errors, nor in the brief or argument of counsel, are the statutes cited or pointed out relating to the summoning of jurors.   Numerous statutes upon this subject have been enacted from time to time, and many changes have been made.

The standing rule of this court for many years has been and still is, that " the brief of counsel for appellant or plaintiff in error shall contain a statement of the errors relied upon and the authorities to be used in the argument."   See Rule 19,

6 Colo. Reports; Rule 20, published in 1887; Rule 17, as published in 1893. The propriety of such rule cannot be doubted. It is not incumbent upon the appellate court to search through volumes of statutes to ascertain what may have been enacted in relation to mere matters of procedure without the assistance of counsel, with the view to giving an opinion concerning the same. In the absence of more specific objections, and in the entire absence of citations of statutes or other authorities, we are warranted in assuming that the challenge to the array is not much relied on, and also in concluding that the trial court did not commit substantial error prejudicial to the accused in the impaneling of the jury in this case; we are not advised that any statute was violated in impaneling the jury, and no complaint is made that any of the jurors were ineligible or amenable to any challenge for cause.

7. At the trial, defense was made solely on the plea of insanity. The killing was not denied, nor was there any attempt to show justification, excuse, or provocation for the homicide. If defendant was capable of *malice aforethought* at the time of committing the homicide, there can be no doubt under the evidence that the killing was malicious, deliberate and premeditated.

After the arraignment of defendant, upon his motion by his counsel and with the consent of the district attorney, the court appointed Dr. J. T. Eskridge, a physician of acknowledged learning, experience and ability, "to make an examination of the said defendant, and to testify on the trial of this cause as to the defendant's mental condition." Counsel for defendant introduced Dr. Eskridge to the accused for the purpose of such examination.

In behalf of defendant several witnesses were examined at the trial for the purpose of showing defendant's mental condition at the time of the homicide, but no physician testified in his behalf upon that subject. In rebuttal Dr. Eskridge was called to testify concerning the examination made by him and to give his professional opinion concerning the alleged

insanity of defendant. This was objected to, *first*, on the ground that testimony as to the sanity or insanity of the accused, was not proper in rebuttal. This objection was properly overruled; the prosecution was not required to offer proof of defendant's sanity in the first instance; defendant being of mature years his capacity to commit crime was to be presumed until something was shown to the contrary. When the defense offered proof for the purpose of showing that defendant was not sane, it was proper for the state to produce rebutting evidence to the contrary. This question has recently received consideration in the case of *Jordan v. The People*, *supra*. The opinion of the physician that the defendant was "sane," based upon the facts testified to by himself and others, was competent evidence. *Gottlieb v. Hartman*, 3 Colo. 62.

The testimony of Dr. Eskridge was further objected to on the ground that his consultation with the accused was professional and confidential, and that any communication made by the accused, and any information gained by the physician in the course of such consultation, were privileged, and could not be divulged without the consent of his patient, the defendant.

This ground of objection is not sustained by the record. The consultation was mutual, not confidential; it was not secured by the accused in his own behalf and for his own sake alone; it was agreed to between the prosecution and the defendant for the express purpose of enabling the physician to testify as to defendant's mental condition. It cannot be that defendant could seek and obtain such an examination at the hands of the court, and with the consent of the prosecution, with the privilege of introducing the testimony if the result of the examination should be favorable to him, and yet reserve to himself the power of excluding the testimony if it should be unfavorable. The objection to the admissibility of the testimony was properly overruled; its weight was for the jury, to be considered in connection with other testimony upon the same subject. *People v. Sliney*, 33 N. E. Rep. 150.

8. A motion for a new trial was interposed upon the ground, *inter alia*, of after-discovered evidence. This was supported by affidavits showing that after the trial another physician, Dr. Eugene Grissom, had read the evidence taken at the trial, and had examined defendant; and that such physician would, if another trial should be granted, testify, giving his professional opinion to the effect that defendant was insane at the time of the homicide. A motion for a new trial on the ground of after-discovered evidence, to be availing, must show that the moving party could not with reasonable diligence have discovered the evidence in time for the former trial. The showing in this respect was not sufficient; it states that defendant's attorney could not with reasonable diligence have discovered and produced the evidence of Dr. Grissom at the first trial; but it does not state that any effort was made to obtain the opinion of any other physician as to defendant's mental condition before the trial. It would be an unwise as well as an unsafe rule to grant new trials for the purpose of allowing a person accused of crime to experiment with professional advisers as to their opinions of his sanity or insanity. If such course were adopted, new trials would become the rule, instead of the exception. No reason is shown why defendant made no further effort to procure the examination or opinion of other physicians, when it was found that the opinion of Dr. Eskridge based upon his examination would not be satisfactory.

The cause was submitted to the jury upon instructions fair and impartial towards the accused; the instructions are not complained of; the verdict was fully justified by the evidence, and we perceive no reason for setting it aside. The judgment of the district court is affirmed.

*Affirmed.*

ON PETITION FOR REHEARING.

PER CURIAM. The only matter presented by the petition for rehearing requiring a further opinion is the challenge to the array. This we might, perhaps, decline to

consider under the salutary rule announced in *Knoth v. Barclay*, 8 Colo. 305; but the great importance of the issue in this case leads us to examine the statute now cited by counsel for defendant in support of his challenge. The particular section relied on reads as follows:

" If at any time the number of ballots in the box shall be reduced to fifty or less, in counties of the first class, and to twenty-five or less in counties of the second, third or fourth class, the judge of the district court may, in his discretion, direct the clerk of said court to certify such fact to the clerk of the board of county commissioners, whereupon it shall be the duty of said clerk to immediately notify each of the county commissioners, and the said commissioners shall forthwith meet, and proceed to select such a number of jurors, as may be designated in the order of the said district judge, and the clerk of said board shall immediately certify to the clerk of said district court, the names of such jurors so drawn; and the clerk of the district court shall place such names in the box ready to be used as occasion may require. Whenever it shall be necessary to bring in a new panel of jurors, the court shall direct that they be drawn from said box. Whenever it shall be necessary to summon talesmen, the court, in its discretion, shall direct that they be drawn from said box, or summoned from the bystanders, *provided* that either party may show cause, why talesmen should not be summoned from the bystanders, or may issue an open venire as heretofore practiced; and, in every case, the *venire facias* shall be returnable as the court shall direct, *provided* it shall be ground for challenge to any person so summoned from the bystanders on an open venire, if he shall have served as a juror either in a regular panel or as a talesman in any court of record within one year then last past." See Session Laws 1891, pp. 250, 251, amending chap. 61, General Statutes.

The box referred to in the foregoing statute is a box in which the names of persons certified by the county commissioners for jury duty are required to be placed, and from which *regular panels* of jurors are to be drawn for service in

the district court. The challenge in this case shows that only one of the array called to try this cause was drawn from the box and summoned upon the regular panel; it also shows that the other jurors composing the array were not summoned as talesmen to try this particular cause.

The statute provides that whenever it shall be necessary to bring in a *new panel* of jurors, the same shall be drawn from the box—that is, from the list certified by the county commissioners; but this does not apply to the summoning of talesmen. It is in the discretion of the court to cause talesmen to be summoned by drawing them from the certified list, or from the bystanders, or by open venire, as heretofore practiced; and such mode of summoning talesmen may be resorted to whenever the regular panel of jurors has become insufficient from any cause, as well as when such panel becomes exhausted in selecting a jury for the trial of a particular cause. Talesmen are persons summoned to make up a deficiency in a panel of jurors regularly summoned; the term is more commonly applied to persons so summoned for a particular cause; but the term is broad enough to include such as may be summoned to supply a deficiency in the regular panel. No prejudice can result to any party by summoning talesmen in advance, provided they are not actually called into the box to the exclusion of the jurors composing the regular panel. It does not appear that any juror of the original or regular panel was thus excluded in this case. It would be a most serious inconvenience if the court were obliged to resort to a drawing from the certified list in order to complete a jury for the trial of a particular cause, or to supply a deficiency in the regular panel; and the language of the statute does not require such construction.

The petition for a rehearing must be denied; the judgment of the district court must stand affirmed; and an order will be entered of record designating the calendar week commencing April 22, A. D. 1894, as the week for carrying the judgment of the district court into effect, as the statute provides.

*Rehearing denied.*