[No. 4595.]

THE PEOPLE EX REL. ELDER, AS TREASURER OF THE CITY AND COUNTY OF DENVER, v. SOURS.

1. **Constitutional Amendment—Presumptions.**

Where an amendment to the constitution is attacked after its ratification by the people, every reasonable presumption, both of law and fact, is to be indulged in favor of its validity.

2. **Constitutional Amendments—Legislative Journals.**

Where a proposed amendment to the constitution was introduced in the senate and before final passage was amended by striking out certain words and inserting the word "and" but the amendment did not materially change the meaning, and as it passed the senate was transmitted to the house, and the house journal shows that no amendment was made or offered in the house and that it was not returned to the senate after its passage in the house, but when it was entered in full upon the house journal, by mistake it was entered as it was originally introduced in the senate, and the house journal itself shows that the difference between the entries of the two houses was due to a clerical error, and it was enrolled and signed by the presiding officers of both houses and published in the session laws as it was passed, the constitutional provision requiring proposed amendments to the constitution to be entered in full upon the journal of each

house was satisfied and it is not invalid because of said difference in the journal entries of the two houses.

**3. Constitutional Amendments—Consolidation of City and County.**

A constitutional amendment consolidating a city and county government into one and providing that the people of the city and county shall adopt a charter which shall provide for the election or appointment of all officers of the city and county and shall designate the officers who shall perform the acts and duties required by the constitution and general laws to be done by county officers, and provides that the citizens of the city and county shall have exclusive power to adopt or to amend their charter or to adopt any measure as provided in the amendment, does not exempt a portion of the state from the provisions of the constitution and general laws of the state, and is not obnoxious to the provision of the enabling act which requires the constitution to be republican in form and not repugnant to the constitution of the United States.

**4. Same—Future Contingencies—Adoption of Charter.**

A constitutional amendment consolidating a city and county government into one and which authorizes the people of the city and county created to make a charter for their government is not invalid on the ground that it is dependent on future contingencies.

**5. Constitutional Amendments.**

Under the provisions of the constitution authorizing amendments the article providing for such amendments may be amended.

**6. Constitutional Amendments—Reasonable Doubt.**

Unless the court is satisfied beyond a reasonable doubt that the constitution has been violated in the submission of a constitutional amendment, the amendment must be upheld.

**7. Constitutional Amendments—New Articles.**

An amendment to the constitution may be proposed by the legislature and adopted, by the addition to the constitution of a new and separate article.

**8. Constitutional Amendments—Limitation of Amendments to Six Articles.**

The provision of section 2, article 19, of the constitution that amendments to not more than six articles of the constitution shall be proposed at the same session of the legislature, applies to express amendments and not to implied or incidental amendments or modifications of other articles of the constitution than the one expressly amended.

**9.  Constitutional Amendments—Several Subjects.**

A constitutional amendment may embrace more than one subject.

**10.  Same—Separate Submission.**

If a constitutional amendment embraces several subjects all of which are germane to the general subject or purpose of the amendment, the several subjects need not be separately submitted but the amendment may be submitted and voted upon as a single proposition.

## Original Proceeding.

The controversy is between C. S. Elder, treasurer of Arapahoe county, and Paul J. Sours, treasurer of the city of Denver. Prior to December 1, 1902, C. S. Elder served upon Paul J. Sours a written demand and notice, in which it is stated that upon the issuance of the proclamation of the governor of the state declaring that article 20 had been ratified by the people, he, the said Elder, became the treasurer of the City and County of Denver, and demanding that the said Paul J. Sours deliver to him, as the treasurer of the City and County of Denver, all moneys, books, papers, records and all property of every kind and nature belonging to the office of city treasurer of Denver. This demand was formally refused on the 1st day of December, 1902, and shortly thereafter the said C. S. Elder filed in this court his petition praying that the writ of mandamus issue, commanding the said Paul J. Sours to turn over to him, the said C. S. Elder, all the property of every kind in the hands of said Paul J. Sours and belonging to the city of Denver.

To this petition Paul J. Sours filed his answer, in which he admitted that he had in his possession property belonging to the city of Denver, that a demand had been made upon him to turn over said property, and that he had declined to turn it over. He further set forth that he was the duly elected treas-

urer of the city of Denver and that he held said property by virtue of his said office, and that the said Elder claimed the said property under an alleged amendment to the constitution of the state of Colorado known as article 20 thereof. That said article 20 was not a part of the constitution of the state, for the reason that the same had not been properly submitted to the people of the state for their approval or rejection. And in the amended answer it is averred that the bill for said constitutional amendment as passed by the senate is not the same as that passed by the house, and that the provision of our constitution which requires that proposed constitutional amendments shall be entered in full upon the journals of the two houses was not complied with.

The questions presented being of great public importance, we decided to take original jurisdiction of the cause under the section of the constitution which authorizes this court to issue the writ of mandamus.

What is called article 20 of the constitution provides for the consolidation of the city and county governments of the city of Denver and of the county of Arapahoe within the limits of the city of Denver into one municipality to be known as the City and County of Denver, and for the government of such consolidated city and county. It is perhaps not necessary to set out the entire amendment. Section 1 is, in part, as follows:

"The municipal corporation known as the city of Denver, and all municipal corporations and that part of the quasi-municipal corporation known as the county of Arapahoe, in the state of Colorado, included within the exterior boundaries of the said city of Denver as the same shall be bounded when this amendment takes effect, are hereby consolidated, and are hereby declared to be a single body politic and

corporate by the name of the "City and County of Denver." By that name said corporation shall have perpetual succession, and shall own, possess and hold all property, real and personal, theretofore owned, possessed or held by the said city of Denver and by such included municipal corporations, and also all property, real and personal, theretofore owned, possessed or held by the said county of Arapahoe, and shall assume, manage and dispose of all trusts in any way connected therewith; shall succeed to all the rights and liabilities, and shall acquire all benefits, and shall assume and pay all bonds, obligations and indebtedness of said city of Denver and of said included municipal corporations and of the county of Arapahoe, by that name may sue and defend, plead and be impleaded, in all courts and places, and in all matters and proceedings; may have and use a common seal and alter the same at pleasure; may purchase, receive, hold and enjoy, or sell and dispose of, real and personal property; may receive bequests, gifts, and donations of all kinds of property, in fee simple, or in trust for public, charitable or other purposes; and do all things and acts necessary to carry out the purposes of such gifts, bequests and donations, with power to manage, sell, lease or otherrwise dispose of the same in accordance with the terms of the gift, bequest or trust; shall have the power, within or without its territorial limits, to construct, condemn and purchase, purchase, acquire, lease, add to, maintain, conduct and operate, water works, light plants, power plants, transportation systems, heating plants, and any other public utilities or works or ways local in use and extent, in whole or in part, and everything required therefor, for the use of said city and county and the inhabitants thereof, and any such systems, plants or works or ways, or any contracts in relation or connection with either, that may

exist and which said city and county may desire to purchase, in whole or in part, the same or any part thereof may be purchased by said city and county which may enforce such purchase by proceedings at law as in taking land for public use by right of eminent domain, and shall have the power to issue bonds upon the vote of the taxpaying electors, at any special or general election, in any amount necessary, to carry out any of said powers or purposes, as may by the charter be provided."

It is then provided that the general annexation laws of the state shall apply to the new municipality as if it were not merged into the City and County of Denver, and that any contiguous town hereafter annexed to the City and County of Denver shall be detached *per se* from any other county and become a municipal and territorial part of the City and County of Denver. And, further, that the City and County of Denver shall alone always constitute one judicial district of the state.

Section 2 provides that the officers of the new city and county and their terms, duties, qualifications and compensation shall be as fixed by the charter.

Section 3, in general terms, provides for the transfer of government from the city of Denver and from the county of Arapahoe to the new municipality. It is set out in full later on in the opinion because the alleged disagreement between the records of the two houses relates solely to the provisions of this section.

Section 4 provides for the making of a charter and prescribes certain limitations to be contained in the charter concerning franchises. It is expressly provided in this section that the people of the City and County of Denver shall always have the exclusive power of making, altering, revising, or amending their charter.

Section 5 provides for new charters and amendments to the charter, and further provides that the city council shall, upon the request of five per cent. of certain qualified electors, submit any amendment to the charter or any measure requested in said petition to the electors of the City and County of Denver.

Section 6 empowers cities of the first and second class to submit to a vote of the qualified electors proposals for charter conventions, that they may adopt charters containing the provisions found in sections four and five of the article, and that they shall have the same powers as to real and personal property and public utilities as is given in section 1.

Section 7 provides for the consolidation of the school districts within the territorial limits of the City and County of Denver.

Section 8 provides that anything in the constitution of this state in conflict or inconsistent with the provisions of this amendment is to be inapplicable to the matters and things by the amendment covered and provided for.

Mr. GUY LeROY STEVICK, Mr. J. WARNER MILLS, Mr. HARRY A. LINDSLEY, Mr. JOHN A. RUSH, Mr. GEORGE F. DUNKLEE, Mr. THOMAS M. PATTERSON and Mr. CHARLES S. THOMAS, for petitioner.

Mr. PLATT ROGERS, Mr. H. M. ORAHOOD, Mr. CHARLES J. HUGHES, Jr., Mr. C. P. BUTLER, Mr. CLAY B. WHITFORD, Mr. FRED W. PARKS, Mr. R. D. REES, Mr. T. E. WATTERS and Mr. H. B. O'REILLEY, for respondent.

Mr. JUSTICE STEELE delivered the opinion of the court.

At the time of the filing of the pleadings in the case, upon the matter being presented, we determined

that the burden was upon the respondent to establish the fact that the constitution had been violated in proposing and submitting the amendment. At the outset it should be stated that every reasonable presumption, both of law and fact, is to be indulged in favor of the validity of an amendment to the constitution when it is attacked after its ratification by the people. In the determination of these questions we ought constantly to keep in mind the declaration of the people in the bill of rights, "That the people of this state have the sole and exclusive right of governing themselves, as a free, sovereign and independent state; and to alter and abolish their constitution and form of government whenever they may deem it necessary to their safety and happiness;" and we should examine the objections which have been raised against the validity of this amendment from the viewpoint of a fair and liberal construction, rather than from that of one which unnecessarily embarasses the exercise of the right of amendment. As was said by Judge Handy in 1856, in delivering the opinion of the court in *Green v. Weller,* 32 Miss. 684: "There is nothing in the nature of the submission which should cause the free exercise of it to be obstructed, or that could render it dangerous to the stability of the government; because the measure derives all its vital force from the action of the people at the ballot-box, and there can never be danger in submitting, in an established form, to a free people, the proposition, whether they will change their fundamental law. The means provided for the exercise of their sovereign right of changing their constitution should receive such a construction as not to trammel the exercise of the right. Difficulties and embarrassments in its exercise are in derogation of the right of free government, which is inherent in the people; and the best security against tumult and revolution, is in the free

and unobstructed privilege to the people of the state, to change their constitution in the mode prescribed by the instrument.''

We shall first consider the objection raised in the amended answer, that the constitution has been violated because the proposed amendment was not entered in full upon the journals of both houses and that the bill for this amendment as passed by the senate was not the bill passed by the house. Section 3 of the amendment, as originally introduced in the senate and as entered on the journal of the house, is as follows:

''Sec. 3.   Immediately upon the canvass of the vote showing the adoption of this amendment, it shall be the duty of the governor of the state to issue his proclamation accordingly, and thereupon the city of Denver, and all municipal corporations and that part of the county of Arapahoe within the boundaries of said city, shall merge into the City and County of Denver, and the terms of office of all officers of the city of Denver and of all included municipalities and of the county of Arapahoe shall terminate; except, that the then mayor, auditor, engineer, council (which shall perform the duties of a board of county commissioners), police magistrate, chief of police and boards, of the city of Denver shall become, respectively, said officers of the City and County of Denver, and said engineer shall be *ex officio* surveyor and said chief of police shall be *ex officio* sheriff of the City and County of Denver; and the then [judges of the district court, district attorney] clerk and *ex officio* recorder, treasurer, assessor, coroner [and county judge] of the county of Arapahoe, and the justices of the peace and constables holding office within the city of Denver, shall become, respectively, said officers of the City and County of Denver, and said district attorney shall also be *ex officio* attorney

of the City and County of Denver. The foregoing officers shall hold the said offices as above specified only until their successors are duly elected and qualified as herein provided for; except that the then district judges, county judge and district attorney shall serve their full terms, respectively, for which elected. The police and firemen of the city of Denver, except the chief of police as such, shall continue severally as the police and firemen of the City and County of Denver until they are severally discharged under such civil service regulations as shall be provided for by the charter; and every charter shall provide that the department of fire and police and the department of public utilities and works shall be under such civil service regulations as in said charter shall be provided."

The journal of the senate discloses that the bill was amended by striking out the words inclosed by brackets, "judges of the district court, district attorney," and "and county judge;" and that after the word "assessor," "and" was inserted. The bill as amended was engrossed and duly transmitted to the house. The house journal shows that the bill was properly referred to a committee, that it was properly read; that it was then referred to the committee of the whole house and again read, referred again to the committee on revision of the house, read for the third time, and passed by a two-thirds majority of the house. In none of the reports or entries in the journals is any mention made of an amendment; and the bill as enrolled, bearing the signatures of the two presiding officers of the legislative assembly, is the same as that published in the session laws, and is the same as that which appear upon the senate journal. In the case *In re Roberts*, 5 Colo. 525, this court stated that these journals "possess the character of public records, and as such are admissi-

ble as evidence of the proceedings of legislative bodies, and this independently of statutory provisions. Their value as evidence, however, is a question for the courts, and will be affected by the internal evidence which such records furnish as to the system and completeness, or carelessness and slovenliness with which they have been kept." And in the case of *Insurance Co. v. Loan, etc., Co.,* 20 Colo. 1, this court held, that the enrolled bill, properly signed, and deposited in the office of the secretary of state, is *prima facie* evidence of the due passage of a statute, and that that presumption should prevail unless overcome by something appearing in the record.

It is said that the constitution does not require a proposed constitutional amendment to be enrolled, and that therefore we should not consider the fact that an enrolled bill has been filed with the secretary of state, but should confine our investigation to the legislative journals; and, if there is a discrepancy between the two journals, that the constitutional provision that the proposal shall be entered in full upon legislative journals has not been complied with. This court, in the Nesbit case, while declaring that the enrollment of a proposal is not required by the constitution, commended the practice of doing so by the legislature because it is likely to insure care and deliberation in considering matters of such great importance. We think we should not be restricted in our investigation to the journals of the two houses, but should determine, as a matter of fact, from all the evidence which can be produced of a public nature, whether the bill as passed by the senate and by the house was the same bill. We are satisfied from an inspection of the journals that the bill as passed by the house was the bill passed by the senate; and we are convinced of this by an inspection of the entries in the house journal, which fail to mention an amend-

ment to the senate bill, by the enrolled bill, which appears in the office of the secretary of state and in the session laws, and by the fact that no record appears in the journal of either house that the bill was returned to the senate for its concurrence in a house amendment. We are also satisfied that the amendment made by the senate was not a material amendment, that it did not change the purpose or scope of the bill and made no substantial or material alteration therein.

The constitution of Kansas requires that amendments proposed to the constitution shall be entered upon the legislative journals. Mr. Justice Brewer of the supreme court of the United States, when one of the justices of the supreme court of Kansas, in passing upon the submission of a proposed amendment which had not been entered upon the journals of the two houses, but had received the signatures of the officers of those houses and had been voted upon by the people of the state, said: "Is a proposition to amend the constitution in the nature of a criminal proceeding, in which the opponents of it stand as defendants in a criminal action, entitled to avail themselves of any technical error or verbal mistake, or is it rather a civil proceeding in which those omissions and errors which work no wrong to substantial rights are to be disregarded? Unhesitatingly we affirm the latter. The central idea of Kansas law, as of Kansas history, is that substance of right is grander and more potent than methods and forms. The two important vital elements in any constitutional amendment are the assent of two-thirds of the legislature and a majority of the popular vote. Beyond these, other provisions are mere machinery and forms. They may not be disregarded because by them certainty as to essentials is secured, but they are not themselves the essentials. * * * Here, also, may

appropriately be noticed the fact that the past tells
the same story of omission from the legislative jour-
nals of the full text of the proposed amendment as it
does by defect in the form of submission. Many
amendments have gone before the people, been adopt-
ed and acted upon as parts of the constitution, when
only the title, scope, and object can be found in
the journals. Another thought, and we pass from
this question. We may not ignore public history.
Nearly two years elapsed between the time the propo-
sition passed the legislature and the day of the pop-
ular vote. During this time this question was not
forgotten. It was discussed in every household and
at every meeting. The state was thoroughly can-
vassed; its merits and demerits were presented and
supported by all possible arguments. Pulpit, press
and platform were full of it. It was assumed on all
sides that the question was before the people for de-
cision. There was not even a suggestion of any such
defect in the form of submission as would defeat the
popular decision. If this objection had been raised
prior to the election, the legislature could have been
easily convened, and the defect remedied. But there
was not a suggestion from friend or foe. The con-
test was warm and active. After the contest was
ended and the election over, the claim is for the first
time made that after all there was nothing in fact
before the people; that this whole canvass, excite-
ment and struggle was simply a stupendous farce,
meaning nothing, accomplishing nothing. This is a
government of the people, by the people, and for the
people. This court has again and again recognized
the doctrine lying at the foundation of popular gov-
ernments, that in elections the will of the majority
controls, and that mere irregularities or informalities

in the conduct of an election are impotent to thwart the expressed will of such majority."—*Prohibitory Amendment Cases,* 24 Kan. 700.

An inspection of the manuscript journal of the house shows that the printed bill (before amendment) was inserted bodily in the house journal; and it seems clear that the failure to make the change made by the senate was a mere clerical omission on the part of the employe of the house. This amendment, as were the amendments in Kansas, was discussed for nearly a year before its submission to the people; it bore the indorsement of every political party; it received at the polls more votes than were theretofore cast for any other amendment submitted to the people. It is shown beyond a reasonable doubt that the bill as amended passed the house; and if the will of the people is to be thwarted by the design or carelessness of an employe of the legislature, then are the foundations of our government unstable and unenduring.

The objections to the provisions of the amendment itself, and to the extent that it, either necessarily or unnecessarily, changes the existing rules of law applicable to the municipal and quasi-municipal corporations embraced within the territorial limits of the City and County of Denver, are more grave and important than the one just passed upon. It is contended that the proposed amendment violates the provisions of the constitution concerning proposals of amedments by the legislature because: 1. It adds a new article to the constitution. 2. It amends more than six articles of the constitution; if not, it amends more than one article, and amendments to five other articles were submitted by the legislature at the same session. 3. It contains distinct amendments of the constitution that should have been submitted separately. 4. The amendment to the constitution that

authorizes six amendments is itself unconstitutional. 5. It was submitted under a deceptive and misleading title.

It is also contended that the amendment is inoperative and void, even though properly proposed and submitted, because: 1. It violates the provision of the fourteenth amendment to the constitution of the United States that "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." 2. It violates the provision of section 4 of the enabling act providing that the constitution shall be republican in form   *  . *   *    and not be repugnant to the constitution of the United States and the principles of the Declaration of Independence. 3. Its operation is dependent upon contingencies.

We shall consider the last three objections before discussing the others.

Under the first objection it is said that some of the adjoining towns have by this amendment lost their public property—that, as the people of these towns had erected town buildings, these town buildings will be taken from them because the towns themselves are consolidated with Denver. That the people of other towns, excluded from the City and County of Denver, have contributed to the erection of public buildings in Arapahoe county, and that they will lose their share or interest in such public buildings and be required to contribute to the erection of public buildings in a new county. These are incidental and unavoidable conditions, which exist whenever the boundaries of counties are changed or municipalities are consolidated. These municipalities exist for the

public convenience, their property is the property of the public, and is held, not as private property, but subject to the changing conditions and requirements of local government. If these changes were dependent upon an act of the legislature, its authority might be scrutinized, but surely it cannot be necessary to inquire into the authority of the whole people thus to appropriate public property to public uses.

The second objection is based upon the construction given by counsel for the respondent to the following provisions in sections 2, 4 and 5, of the amendment:

"The officers of the City and County of Denver shall be such as by appointment or election may be provided for by the charter; and the jurisdiction, term of office, duties and qualifications of all such officers shall be such as in the charter may be provided; but every charter shall designate the officers who shall, respectively, perform the acts and duties required of county officers to be done by the constitution or by the general law, as far as applicable."

\*    \*    \*    \*    \*    \*    \*    \*

"The charter and ordinances of the city of Denver as the same shall exist when this amendment takes effect, shall, for the time being only, and as far as applicable, be the charter and ordinances of the City and County of Denver; but the people of the City and County of Denver are hereby vested with and they shall always have the exclusive power in the making, altering, revising or amending their charter, and, within ten days after the proclamation of the governor announcing the adoption of this amendment the council of the City and County of Denver shall, by ordinance, call a special election, to be conducted as provided by law, of the qualified electors in said City and County of Denver, for the election ot twenty-one taxpayers, who shall have been

qualified electors within the limits thereof for at least five years, who shall constitute a charter convention to frame a charter for said City and County in harmony with this amendment.''

\*     \*     \*     \*     \*     \*     \*     \*

"The citizens of the city and county of Denver shall have the exclusive power to amend their charter or to adopt a new charter, or to adopt any measure as herein provided.''

Counsel say: "Had it been the intention that the constitution and laws should be in force in this territory, this instrument would have so stated. The language of the above provisions is plain and unambiguous. It has been said that in construing a constitutional provision it will be presumed that every word was weighed and its meaning carefully considered before its insertion in the instrument; and this instrument says that the city and county of Denver can adopt *any measure,* and shall always have the exclusive power to make, alter and revise their charter. That means everything. If not, why not? This charter is to be the organic law. A legislative act is now the charter of the city of Denver, and the constitution of this state and the laws thereof constitute the organic law of this county. But this instrument changes all this, and says that the charter as framed by the charter convention shall not only be the charter of the city and county, but shall be the organic law thereof. That language means something. It displaces, and was intended to displace, the constitution, the laws, and the general assembly.''

If this amendment must be given that construction, it can not be sustained. Even by constitutional amendment, the people cannot set apart any portion of the state in such manner that that portion of the state shall be freed from the constitution, or delegate the making of constitutional amendments concerning

it to a charter convention, or give to such charter convention the power to prescribe the jurisdiction and duties of public officers with respect to state government as distinguishel from municipal, or city, government. The duties of judges of the district court, county judges, district attorneys, justices of the peace, and, generally, of county officers, are mainly governmental; and, so far as they are governmental, they may not be controlled by other than state agencies without undermining the very foundation of our government. Under the constitution of the United States, the state government must be preserved throughout the entire state; and it can be so preserved only by having within every political subdivision of the state, such officers as may be necessary to perform the duties assumed by the state government, under the general laws as they now exist or as they may hereafter exist.

This distinction between the governmental duties of public officers and their municipal duties is fundamental, and therefore is not avoided or affected by the consolidation.

"Counties, townships, school districts and road districts do not usually possess corporate powers under special charters; but they exist under general laws of the state, which apportion the territory of the state into political divisions for convenience of government, and require of the people residing within those divisions the performance of certain public duties as a part of the machinery of the state; and, in order that they may be able to perform those duties, vest them with certain corporate powers. Whether they shall assume those duties or exercise those powers, the people of the political divisions are not allowed the privilege of choice; the legislature assumes this division of the state to be essential in republican government, and the duties are imposed

as a part of the proper and necessary burden which the citizens must bear in maintaining and perpetuating constitutional liberty."—Cooley's Constitutional Limitations, 240.*

"A *municipal corporation proper* is created mainly for the interest, advantage and convenience of the locality and its people; a county organization is created almost exclusively with a view to the policy of the state at large, for the purposes of political organization and civil administration, in matters of finance, of education, of provision for the poor, of military organization, of the means of travel and transport, and especially for the general administration of justice. With scarcely an exception, all the powers and functions of the county organization have a direct and exclusive reference to the general policy of the state, and are, in fact, but a branch of the general administration of that policy.—1 Dillon's Municipal Corporations, § 23.

The respondent's construction, however, is not that placed upon the amendment by the counsel for the petitioners, or, we assume, by the people. The provision that "Every charter shall designate the officers who shall, respectively, perform the acts and duties required of county officers to be done by the constitution or by the general law, as far as applicable," completely contradicts the assumption that the amendment regards such duties as being subject to local regulation and control. The amendment is to be considered as a whole, in view of its expressed purpose of securing to the people of Denver absolute freedom from legislative interference in matters of local concern; and, so considered and interpreted, we find nothing in it subversive of the state government, or repugnant to the constitution of the United States.

It is said that the amendment is void because it is dependent upon future contingencies. That the

proposal, if valid, became a part of the constitution upon its ratification; whereas, the provisions relative to the creation of a charter for Denver depend upon the will of the people, which may never be exercised. In other words, that the amendment is invalid because it authorizes the people of the City and County of Denver to make a charter and that the people of Denver may never make one. This is not a contingency within the meaning of the law.

It is stated that the proposal was submitted under a misleading and deceptive title. There is no proof that any elector was deceived by the title under which the amendment was submitted, and the proposed amendments were published in full in a newspaper in each county in the state for four weeks preceding the election. In this connection it is urged that the people who voted for this amendment constituted only a minority of the electors of the state and that only about one-third of the electors expressed themselves upon the subject of the amendment. This is not very important, for we should be compelled to sustain this amendment though but a bare majority of the electors had favored it, if, in our opinion, it was legally submitted and ratified, and we should declare it invalid if its invalidity were established beyond a reasonable doubt, although it had received the unanimous support of the electors. It is hard to account for the apparent indifference of the people on the occasion of the submission to them of changes in their organic law. The indifference which prevails in Colorado prevails in other states, and it rarely occurs that a proposed amendment to the constitution receives the attention of more than one-half of those who vote for candidates for office. In the absence of a constitutional provision to the contrary, the people who do not express themselves upon the subject submitted to them are

regarded as having assented to a determination by those who do express themselves.

The amendment which authorizes six amendments is attacked because, as it is said, it was not the intention of the framers of our constitution to permit revision and alteration of the constitution except by constitutional convention. The original constitution does not say that the article entitled amendments cannot be amended, but says that the legislature of the state shall not propose amendments to more than one article at one session.

The remaining objections are based upon the respondent's construction of section 2, article 19 of the constitution, which is as follows:

"Any amendment or amendments to this constitution may be proposed in either house of the general assembly, and if the same shall be voted for by two-thirds of all the members elected to each house, such proposed amendment or amendments, together with the ayes and noes of each house thereon, shall be entered in full on their respective journals; the proposed amendment or amendments shall be published with the laws of that session of the general assembly, and the secretary of state shall also cause the said amendment or amendments to be published in full in not more than one newspaper of general circulation in each county, for four successive weeks previous to the next general election for members of the general assembly; and at said election the said amendment or amendments shall be submitted to the qualified electors of the state for their approval or rejection, and such as are approved by a majority of those voting thereon shall become part of this constitution. Provided, That if more than one amendment be submitted at any general election, each of said amendments shall be voted upon separately and votes thereon cast shall be separately counted the

same as though but one amendment was submitted. But the general assembly shall have no power to propose amendments to more than six articles of this constitution at the same session."

In the main we regard the questions presented as judicial, although in the briefs and arguments upon the relevancy of certain provisions of the amendment to its main object or purpose, questions of policy and expediency have been discussed which are legislative rather than judicial; but we are clearly of opinion that the legislature cannot propose an amendment to the constitution not in substantial compliance with its provisions.

It appears to be a universal rule that unless the court is satisfied beyond a reasonable doubt that the constitution has been violated in the submission of a constitutional amendment, the amendment must be upheld. This is not a flexible rule, to be applied to suit emergencies, but is a rule adopted to secure to the people the right they have to change the organic law whenever necessary for their safety and happiness. It means that whenever the will of the people has been ascertained in a manner conforming substantially to the provisions of the constitution, that the court shall brush aside all merely technical obstructions, without regard to the result. It is not properly applied by merely recognizing and stating it at the beginning of an opinion, and afterward rejecting every liberal doctrine of construction by which learned judges and learned courts have been able to reconcile, and permit to stand, each within its own sphere, constitutional or statutory provisions that appear to be repugnant.

We are not only not satisfied beyond a reasonable doubt that the constitution has been violated, but are of opinion that the amendment proposed can be

sustained upon purely legal principles, supported by adjudicated cases.

It is first contended that the constitution has been violated in this, that the proposal adds a new article to the constitution. It does not appear to be disputed that an amendment may consist in the adding of something new, but it is insisted that that clause of our constitution which prohibits amendments to more than six articles at one session is a limitation upon the power of the legislature, and that no subject not embraced within the existing articles can be added to the constitution in the form of an amendment. In the address to the people of Colorado, the committee of the constitutional convention said: "We have provided liberally for the amending of the constitution, thus giving to the people frequent opportunities of changing the organic law when experience and public policy may require it." The constitution, as it was adopted by the people, contained this provision: "But the general assembly shall have no power to propose amendments to more than one article of this constitution at the same session." If it were intended that no subject except those treated of in the constitution should be included in an amendment thereto, then the language adopted by the framers of the constitution in their address to the people, that frequent opportunities of changing the organic law have been provided, whenever experience and public safety may require it, is, to say the least, misleading. In the constitution itself there is no limitation as to new articles. It provides that any amendment or amendments may be proposed by the general assembly, and, when ratified by the people, shall become a part of the constitution; the only limitation being that the legislature shall have no power to propose amendments to more than one article at the same session. The argument

advanced by the relator to the effect that, there being no limitation upon the legislature concerning new articles or subjects, it has plenary power, is convincing, and he has raised in our mind a doubt as to the meaning of the section; and if this contention corresponded with the legislative interpretation, we should resolve the doubt in favor of the construction thus contended for. But we are inclined to accept the construction placed upon the constitution by the legislature. In the legislature of 1901, that proposed this amendment, there were twenty-one senators who were members of the senate that proposed the amendment authorizing six amendments, and they appear to have placed the construction upon their work which prohibits the submission of more than six amendments to the constitution, whether the amendments are to be considered as new articles or as amendments to articles of the constitution as it then existed; and there is abundant authority, not only in this state but in every other state of the Union, to the effect that contemporaneous construction by the legislature of a doubtful or ambiguous provision of the law or constitution should have great weight with the courts. Without regard to the question as to whether the subject embraced in the proposed amendment is a new article or is an amendment to an existing article of the constitution, it seems to us that the legislature, and not the courts, should be the sole judge of the title of the proposed amendment. And it does not seem to us that it can make the slightest difference whether it be termed a new article or an amendment to an existing article. If, as a matter of fact, it receives the votes of two-thirds of the members of each house of the legislature and the constitutional majority of the people, it becomes a part of the constitution. There is no rule of law which requires that a constitutional amendment shall be ger-

mane to the section which it proposes to amend; and no court has ever said that the will of the people shall be overthrown, simply because the legislature, in proposing an amendment, has given it a title not germane to the subject. This is the construction placed upon this provision of our constitution by the legislature within a few years after its adoption. In the year 1881 an amendment to the legislative article was proposed. A section of the legislative article provided that the legislature should not pass a law extending the term of office of any public officer, nor law increasing or diminishing his salary or emoluments after his election. An amendment to that section was proposed by the legislature. The amendment provided that the governor should receive a salary of five thousand dollars, that his private secretary should receive a salary of fifteen hundred dollars, that the judges of the supreme court should each receive a salary of five thousand dollars, and that the district judges should each receive a salary of four thousand dollars. The amendment was ratified by the people and is now a part of the constitution; and the governor, his private secretary, the judges of this court and the judges of the district court have, since the year 1882, when said amendment was ratified, been receiving salaries in accordance with that provision of the constitution.

Here was an amendment to a section which prohibited the legislature from passing a law increasing the salaries of persons in office, and the people amended that section by declaring that the governor and his private secretary, the judges of the supreme court and the district judges, should receive a certain stipulated salary and that those in office at that time should receive the salary therein named. The amendment had not the slightest connection with the subject of the section amended, and yet it has never

been questioned, and has remained a part of the constitution until this day.

The people of Illinois in 1886 added to their constitution what is termed a special section, which embraces a new subject and one not contained in any other article of the constitution. This amendment was submitted to the people of Illinois under a joint resolution of the legislature in the following words:

"*Resolved by the Senate, the House of Representatives concurring herein,* That there be submitted to the people of the state of Illinois for their ratification, or rejection, at the next general election for members of the general assembly, the following additional amendment to the constitution:

"*Resolved,* That hereafter it shall be unlawful for the commissioners of any penitentiary, or other reformatory institution in the state of Illinois, to let by contract to any person, or persons, or corporations, the labor of any convict confined within said institution."

In Illinois, with identically the same powers and limitations as to amendments, an independent section was proposed by the legislature. No reason has been urged why this may not be done except that it would permit the legislature, by subterfuge, to evade the provision that the general assembly shall have no power to propose amendments to more than six articles at the same session. The members of the legislature are not lawbreakers, and we do not think that the constitution is to be construed on the assumption that the legislature will seek to evade its limitations. An evasion by subterfuge is a deliberate violation of the constitution, and is impossible with officers who have taken an oath to support it.

We think, therefore, that the legislature may propose a new article to be submitted as an amendment to the constitution.

It is next contended that the amendment itself amends more than six articles of the constitution, and is therefore void because in violation of section 2, article 19 of the constitution as amended, which provides that the legislature shall have no power to submit amendments to more than six articles of the constitution at any one session. We are of opinion that this position of counsel is untenable. But one amendment to the constitution was proposed by this article. It will be conceded that it limits, modifies, or abrogates, within certain territory, provisions contained in different articles of the constitution. The purpose of the amendment is to consolidate the city of Denver and a portion of the county of Arapahoe into a new sort of municipality having the combined powers of city and county governments, and to extend to the other cities of the state the privilege of adopting charters in substantially the same manner as is provided for the adoption of the Denver charter, granting to such cities the same power as to real and personal property and public utilities as is granted to the City and County of Denver. The powers of city and county municipalities being essentially different, in investing this new municipality with the powers of both, it became necessary to modify the provisions of the constitution relative to municipal affairs, by providing new ones applicable to such combined government; but this is not an amendment of those provisions such as, in our judgment, was in contemplation by the framers of the constitution, because the constitutional provisions that are abrogated as to the City and County of Denver remain in force generally throughout the state.

The constitution of Illinois contains the identical language found in our own in reference to the initiative by the general assembly. Both constitutions

limit the power of the general assembly in these words: "But the general assembly shall have no power to propose amendments to more than one article of this constitution at the same session." In 1878 an amendment was proposed to the legislative article of the Illinois constitution, and section 31 of article 4 was amended, authorizing the general assembly to provide for the organization of drainage districts, granting to the corporate authorities thereof the right of eminent domain, and empowering them to construct drains and levees and to keep those already constructed in repair by special assessment upon the property benefited thereby. Pursuant to this authority, the legislature enacted a comprehensive law upon the subject, entitled the drainage law. Our attention is directed to four cases in the supreme court of Illinois in which this law and the amendment authorizing it were under consideration. In the case *Moore's Executors v. Lewis*, 106 Ill. 376, the law was assailed because in conflict with article 9 of the constitution. The court said: "The act under which the proceedings were had was passed under the authority of the amendment to section 31, article 4, and authorized by it, and if sections 1, 9 and 10 of article 9 ever had any bearing upon an assessment of this character, after this amendment became a part of the organic law it would control regardless of the provisions of the original constitution."

In the case *Huston v. Clark*, 112 Ill. 344, the law was again assailed upon the ground that it was unconstitutional in that it violated the provisions of article 9. The court said: "The special amendment of the constitution adopted in 1878, so far as it invades the former limitations of the constitution, must prevail, and such limitations are not applicable to the subject of this special amendment."

In the case *Wilson v. Board of Trustees,* 133 Ill. 446, the law enacted under the authority of the amendment of 1878 was again considered by the court, and it was held that, "Before the adoption of section 31 of article 4 of the constitution, drainage districts could not be invested with power to make local improvements by special assessments—only cities, towns and villages could be invested with such power (article 9). Since its adoption, drainage districts, as well as cities, towns and villages, can make local improvements by special assessments, but not by special taxation of contiguous property. The amendment of section 31 operated as a removal of the previous constitutional restriction upon the power of the legislature, and not as a grant of power."

In the case *Wabash Railroad v. Drainage and Levee District,* 194 Ill. 310, the court, recognizing that there was an apparent conflict between articles 2 and 11, and the amendment to article 4, said:

"Section 31 of article 4 of the constitution of 1870, as amended, under which the statute authorizing the appellee district to become incorporated was enacted, is paramount to constitutional limitations incorporated in the constitution as originally framed, with which it is in conflict. (Huston v. Clark, 112 Ill., 344.) To the extent the amendatory section invades the limitations and safeguards erected by said section 13 of article 2 and section 14 of article 11 of the constitution, for the safety and preservation of private property, the provisions of the amended section must prevail, but in all other respects those limitations and safeguards remained unimpaired and in full force and vigor as part of the organic law of the state."

The constitution of Illinois is the only constitution containing the identical language employed by

the framers of ours, and it is altogether probable that this provision was copied from the constitution of Illinois. This amendment to the constitution of Illinois confessedly modifies and limits four articles of the constitution, yet its validity has not been questioned; on the other hand, it has been repeatedly held that the amendment not only changed the section which it expressly amended, but limited and modified other articles of the constitution.

In the case *In re Speakership*, 15 Colo. 520, in an opinion by Mr. Justice Elliott, our own supreme court recognized the validity of an amendment to the constitution which by implication modified another article of the constitution. This decision was rendered at a time when our constitution provided that the legislature should have no power to propose amendments to more than one article at the same session. The court says: "It was urged in argument with great force that this court ought not to express any opinion upon the questions presented by the executive, for the reason that it would be an interference with matters pertaining exclusively to the legislative department of the government, and therefore in conflict with article 3 of the constitution, which divides the governmental powers of the state 'into three distinct departments—the legislative, executive and judicial'—and forbids those of one department from exercising 'any power properly belonging to either of the others, except as in this constitution expressly directed or permitted.' * * * It must be admitted that the promulgation of a judicial opinion in response to an *ex parte* inquiry from the executive department of the government, concerning the affairs of the legislative department, is anomalous and peculiar, and, apparently, at least, inconsistent with the prevalent American system of separating the governmental powers

into distinct departments. But it must be borne in mind that the same instrument which divides the powers of government into distinct departments has been so amended by the voice of the people as to require the supreme court to 'give its opinion upon important questions, upon solemn occasions, when required by the governor, the senate or the house of representatives.'—Article 6, section 3.''

We have, then, the opinion of the supreme court of Illinois, the opinion of the legislatures of Illinois and of this state, and the opinion of this court that amendments by implication are permissible in amendments to the constitution, and that the constitutional provision limiting the power of the legislature to the proposal of amendments to one article, refers to express amendments, and not to amendments by necessary implication. There is no similar limitation in the constitution of any other state, consequently usage and decision in Illinois since 1848 and in this state since 1876 ought to determine the meaning to be given to the words, ''but the general assembly shall have no power to propose amendments to more than one article of this constitution at the same session.'' There is no constitutional provision in this state or in any other state, controlling, or attempting to control, the implied amendment of different articles or of different sections. In fact, there is no such thing as an implied amendment to the constitution. The constitution is a written instrument, and every amendment to it is express. ''Amendment by implication'' is merely a phrase in common use, because convenient, to indicate that rule of construction by which a later repugnant provision in a constitution or statute modifies or abrogates an earlier one.

Tested by the rule so earnestly insisted upon by the respondent, that early amendment to the consti-

tution of this state relating to the salaries of certain officers is palpably, obtrusively and flagrantly in violation of the provision against amending more than one article at the same session. In article 4 it was then provided, that the governor should receive for his services a salary to be established by law, which should not be increased or diminished during his official term. In article 6 it was then provided, that the salaries of the judges of the supreme and district courts should be such as might be provided by law. The amendment itself purported to amend article 5, yet it fixed the salaries of these officers, and thereby as clearly modified or abrogated these provisions of articles 4 and 6 as if they had been amended by several amendments, submitted at different sessions of the legislature. That amendment was proposed and adopted so shortly after the adoption of the constitution that it may be regarded as a contemporaneous construction of the meaning of the limitation. In view of this contemporaneous construction, it appears to us that we must sustain this amendment upon the ground that this provision was intended to prevent the submission of too great a number of proposed amendments by the legislature at one session, rather than to preserve the several articles as complete and independent subjects by limiting the scope of a single proposal.

It is next contended that the proposed amendment contains several subjects and therefore is in fact several amendments, and that the constitution requires that each amendment shall be separately submitted. The constitution does not require the submission of separate subjects. It provides that each amendment shall be separately submitted, and it has been the custom of the legislature to submit each proposal separately. In the first amendment proposed

to the constitution several distinct and separate subjects were submitted for consideration. It was provided that the output of mines should be exempt from taxation for ten years, that certain ditches and canals should be exempt from taxation, that household furniture of the value of two hundred dollars should be exempt from taxation; and it might be argued, as it was argued in this case, that one might be willing to exempt household goods of the value of two hundred dollars from taxation and not be willing to exempt ditches from taxation; that he might be willing to exempt the net output of mines for the period of ten years from taxation, but not willing to exempt ditches from taxation; and that because each subject was not separately submitted, the submission was void. The amendment was submitted in the year 1879, and ratified by the people, and has been recognized as a part of our constitution from that day to this.

In the case of *Nesbit v. The People,* 19 Colo. 441, Mr. Justice Elliott, speaking for the court, said: "The power of the general assembly to propose amendments to the constitution is not subject to the provisions of article 5 regulating the introduction and passage of ordinary legislative enactments. A proposed amendment to the constitution need not be restricted, like an ordinary legislative bill, to a single subject. The only restriction is, that amendments shall not be proposed to more than one article of this constitution at the same session."

So that the rule of construction that the act shall embrace but one subject is not applicable to a constitutional amendment. But even if we were to regard this amendment as an act of the legislature, it could still be sustained as against the objection that it embraces more than one subject, and be sustained by the decisions of this court and by the decisions

of the courts of many of the states of the union. Section 21 of article 5 of our constitution provides, that "No bill  *  *  *  shall be passed containing more than one subject, which shall be clearly expressed in its title." This is the identical language of the constitution of Missouri. The supreme court of the state of Missouri, in the case of *Wolfe v. Bronson*, 115 Mo. 271, in construing this section of their constitution, said: "If all the provisions of the bill have a natural relation and connection, then the subject is single, and this, too, though the bill contains many provisions."

And in the case of *Lynch v. Murphy*, 119 Mo. 164, the court says, construing the same section of the constitution: "The generality of an act is not objectionable so long as it is not used to conceal legislation incongruous in itself or which by no fair intendment can be considered as having a necessary or proper connection with the title. No provision in a statute having natural connection with the subject expressed in it is to be deemed within the constitutional inhibition that no bill shall contain more than one subject."

The constitution of Wisconsin contains a provision (section 1 of article 12) that if more than one amendment be submitted they shall be submitted in such manner that the people may vote for or against such amendments separately. An amendment proposed by the legislature and ratified by the people was attacked upon the ground, among others, that it contained several subjects and propositions, which had not been separately submitted. In passing upon this objection the court said: "This provision can have but two constructions: First, it may be construed as is contended for by the learned counsel who contends that the amendment under controversy was not properly submitted, that every proposition

in the shape of an amendment to the constitution, which standing alone changes or abolishes any of its present provisions, or adds any new provision thereto, shall be so drawn that it can be submitted separately, and must be so submitted. Such a construction would, we think, be so narrow as to render it practically impossible to amend the constitution; or, if not practically impossible, it would compel the submission of an amendment which, although having but one subject in view, might consist of considerable detail, and each separate provision, though all promotive of the same object and necessary to the perfection and practical usefulness thereof if adopted as a whole, in such form that a defeat of one of its important matters of detail might destroy the usefulness of all the other provisions when adopted. Take the case as presented by the amendment under consideration. The learned counsel admits that the proposition to change from annual to biennial sessions is so intimately connected with the proposition to change the tenure of office of members of the assembly from one year to two years, that the propriety of the two changes taking place, or that neither should take place, is so apparent that to provide otherwise would be absurd. * * * We think amendments to the constitution, which the section above quoted requires shall be submitted separately, must be construed to mean amendments which have different objects and purposes in view. In order to institute more than one amendment, the propositions submitted must relate to more than one subject, and have at least two distinct and separate purposes not dependent upon or connected with each other. Tested by this rule, the propositions submitted to the electors contained but one amendment. It is clear that the whole scope and purpose of the matter submitted to the electors for their ratification was the change from

annual to biennial sessions of the legislature. It was so spoken of by the legislative bodies which passed it, as well as by the electors who ratified it. To make that change it was necessary, in order to prevent the election of members of assembly, half of whom would never have any duties to perform, that a change should be made in their tenure of office as well as in the time of their election, and the same may be said as to the change of the tenure of office of the senators. * * * The direction in the constitution requiring separate amendments to be submitted separately has no efficacy in determining what constitutes an amendment as distinguished from what constitutes two or more amendments; and as the word 'amendment' is clearly susceptible of a construction which would make it cover several propositions, all tending to effect and carry out one general object or purpose, and all connected with one subject, as well as of the construction that every proposition which effects a change in the constitution, or adds to or takes from it, is an amendment, the construction which has been uniformly adopted by all the departments of the government for a series of years is entitled to great weight in settling by judicial decision what construction should be placed upon it. * * * We do not contend that the legislature, if it had seen fit, might not have adopted these changes as separate amendments, and have submitted them to the people as such; but we think, under the constitution, the legislature has a discretion, within the limits above suggested, of determining what shall be submitted as a single amendment, and that they are not compelled to submit as separate amendments the separate propositions necessary to accomplish a single purpose."—*State ex rel. Hudd v. Timme*, 54 Wis. 318.

To the same general effect is *State v. Herriod,* 10 S. D. 109.

We therefore conclude that the disagreement between the journals is a mere clerical mistake, that the same bill in fact passed both houses, and that the entering by mistake upon the journal of the house of the half dozen words quoted does not violate the provision of the constitution requiring the proposal to be entered in full upon the journals of both houses. That, under the constitution, the legislature may propose an amendment as an original article or as an amendment to an existing article. That the limitation that the legislature may not propose amendments to more than six articles of the constitution at the same session does not apply to constructive amendments, or amendments by implication. That an amendment may embrace more than one subject. That if an amendment embraces more than one subject, said subjects need not be separately submitted if they are germane to the general subject of the amendment, or if they are so connected with or dependent upon the general subject that it might not be desirable that one be adopted and not the other.

That this amendment does relate to a single, definite object or purpose, and that the several matters objected to as not germane thereto do appear to be so connected with or dependent upon that object or purpose that they ought not to have been separately submitted.

We have examined all the questions presented, and have disposed of those we regard as essential to a determination of the case.

We do not hold that in proposing amendments to the constitution, the document itself can be ignored, or that, because the people have ratified it, an amendment proposed in violation of the constitution nevertheless becomes a part of that instrument; but

hold that in the proposal and submission of this amendment, the constitution has not been violated.

We are not unmindful of the fact that authorities have been cited which support views contrary to many of those herein stated, but when a constitutional provision is fairly susceptible of two interpretations—one which will overthrow the will of the majority as ascertained at a general election, will cast discredit upon amendments that have been long acted upon as part of the constitution, and will convict legislature after legislature of a disregard for the provisions of the constitution; and one which will produce the contrary result—our duty is plain.

Let judgment be entered in favor of the petitioner, in accordance with the prayer of the petition.

Mr. JUSTICE GABBERT concurring specially:

The sole question presented for determination is, whether or not article 20 is valid, in so far as that proposition has been raised by respondent, or he has presented any bearing upon that question which may affect his rights in the premises. The requisite number of members elected to each house voted to propose it. The notice of its submission to the people for their adoption or rejection, as required by the constitution, was given by publication in full in the Session Laws of 1901, and in a newspaper in every county for the required length of time before election. In addition, it was endorsed by nearly every political party in the state. On account of its features, it was very fully discussed through the public press. No one has been misled as to its scope and purpose. Every opportunity was afforded the people to become acquainted with its provisions before submission for their action. They have voted in favor of its adoption. In such circumstances, it should be upheld, unless for an ob-

jection which cannot be overcome, there is no escape from declaring it invalid. On the other hand, if the provisions of the constitution relative to amendments have not been complied with, then the conditions recited cannot save it from being declared invalid.

The constitution is the paramount law of the state, created by the people themselves. They have reserved the right to amend that law, but wisely placed restrictions on the exercise of this power, and prescribed a procedure to be followed in the proposal and submission of amendments to their fundamental law. They are not above this law, and therefore cannot amend the constitution except through a substantial compliance with its provisions on the subject of amendment. All the objections raised to article 20 possessing any merit involve the single one of whether or not this rule of law has been observed.

The first question to consider is the claim that the amendment was not entered in full on the journal of the house. It was first introduced in the senate. Before final passage by that body it was amended by striking out certain words, and inserting the word "and" after "assessor." It was transmitted to the house in this form, and entered upon the journal of the latter as it read before amendment by the senate. This, however, the house journal clearly shows was an error. That journal does not show that any amendment was offered to it in the house. Its phraseology, as transmitted from the senate, is not disputed. The house journal shows that it was introduced in the house as received from the senate. The journal of the house does not show it was returned to the senate after passage by the house. The journal of the latter contains all the amendment as passed by the senate except the word "and." The omission of this word did not change the meaning of the amendment in the slightest degree. It is clear,

therefore, from the house journal itself, that the difference between the respective journals of the two bodies in the wording of the amendment in so far as it relates to the words stricken out by the senate, is due solely to a clerical error in the house journal. What this journal does, in fact, show on the subject must be determined from its contents as a whole, and not from what may appear at any particular place. Thus tested, it is apparent that the proposed amendment as passed by the house and spread upon its records with the exception of the immaterial word. "and," is identical with that passed by the senate, and the constitutional provision requiring a proposal to amend the constitution to be entered in full on the journal of each house, is satisfied.

The next question is, whether the constitution may be amended by the addition of a new article. The power of the general assembly to propose amendments is expressed in article 19 in the broadest possible terms, and it is only necessary to consider the subsequent restrictions imposed on this power and the procedure provided for its exercise in order to determine that question. Neither limitation nor procedure inhibit the proposal of an amendment by way of a new article. Except as limited by the constitution, the authority of the general assembly to submit amendments is plenary. So long as they keep within the limitation imposed and follow the prescribed steps, it is immaterial in what form they submit an amendment to the people for adoption or rejection. Article 20 is, therefore, not invalid because an added one, unless some provision of the constitution relative to its submission has been violated.

The constitution prohibits the general assembly from proposing amendments to more than six articles at any one session, and the next question to consider

is, the character of modification which it was the purpose of the constitution to inhibit by the limitation under consideration. An amendment which modifies an existing provision of the constitution without an intervening cause is a direct change. Through such a change other provisions may be modified. The latter, however, is an incident of the first. If the incidental changes following a direct one affected the power of the legislature to propose amendments, then practically the constitution has in one breath conferred upon them the power to submit amendments, and in the next taken it away. All law must be given that reasonable construction which is capable of practical application. To measure the power of the legislature to propose amendments by both direct and incidental effects would render their authority in the premises practically nugatory, a mere dead letter, and leave us without any rule whereby the validity of an amendment as measured by its effect upon existing articles of the constitution, could ever be determined with any degree of certainty at the time of its proposal. I therefore conclude that mere incidental modifications of the constitution resulting from an amendment do not come within the constitutional limitation relating to the number of amendments which may be proposed by the general assembly at any one session.

That article 20 does affect more than six preceding articles must be conceded, so the next proposition is, are these changes as pointed out by counsel for respondent, other than incidental? The specific purpose of article 20 is to confer upon the city of Denver and cities of the first and second class, the power of self-government with respect to certain governmental matters based upon special constitutional provisions. In this respect it introduces an entirely new feature into the constitution by the addi-

tion of a new and distinct article, having one comprehensive and special object. The several provisions it contains appertain to the main subject which it embraces, and while they do change and modify the organic law so far as the municipalities affected are concerned, these modifications are only the natural results following the new plan of government provided specially for them, through which these changes are effected; hence, they are mere incidents of the main purpose of the amendment, and do not amend the constitution in the sense which it was intended to inhibit by the limitation on the power of amendment through legislative proposal.

The final question is, whether or not more than one amendment is embraced in article 20. Having reached the conclusion that it has but the one general purpose indicated, and that it does not amend any of the preceding articles in the constitutional sense, contemplated by article 19, that question is easily answered. Its several provisions with respect to the particular governmental subjects which it covers are each dependent upon the other in order to effect the main purpose, and therefore, do not come within the provision requiring several amendments to be submitted separately. In other words, the whole scope and purpose of the amendment was to provide home rule for certain cities with respect to certain governmental matters local in their nature. This is apparent from the contents of the amendment itself, as well as the provisions designating what should appear upon the official ballot in order to enable the electors to vote for or against its adoption. Its several provisions all relate to this one general object, and are designed to accomplish this one purpose, in so far as they relate to cities designated in the amendment either by name or class; so that as a whole, it constitutes but one amendment, having but

one subject-and one purpose. What particular subjects, however, relating to governmental affairs are embraced in the amendment is a matter for the convention assembled to form a charter to most carefully consider. It should also be borne in mind that there may be provisions of the constitution other than article 20 which must be observed in the creation of a charter.

As to the other questions discussed by my brother Steele which I have not touched upon, I agree with his conclusion without attempting to discuss them, with the exception of the one affecting the rights of the adjacent towns, which I do not think presents any proposition which respondent can raise in these proceedings.

I concur in the judgment for petitioner.

CHIEF JUSTICE CAMPBELL, dissenting.

The decision of the majority is, in my judgment, radically wrong. The importance of the amendment, and the public interest in it, but chiefly my firm conviction that constitutional inhibitions have been ignored and a precedent established which overturns, without saying so, our previous decisions, lead me to express at length my views upon the legal questions involved.

And it is only legal questions that will be discussed. It has often been declared by courts in passing upon the validity of statutes and constitutional amendments that with the wisdom or policy thereof they have nothing whatever to do. That laymen sometimes believe that a court, in sustaining or invalidating an act of the legislature, is merely announcing the views of its individual members with respect to the merits of the measure may not be surprising; but it is amazing to find, as we do in this case, a lawyer's brief in which many pages are de-

voted to an attempt to impress upon the court the wisdom of a measure whose validity is the only thing it can consider. My associates, in thinking that it should be upheld, and I in believing it to be invalid, are not thereby expressing our approval or disapproval of the system of municipal government which this amendment provides. Our individual views as to its policy should find no place in a judicial opinion. We are confined to the simple question as to whether it is now a part of the organic law.

Under our form of government, a written constitution is intended to be more permanent than an enactment of the legislature. It is the product of a convention chosen for the specific purpose of framing the supreme law of a sovereign state, and for this most important work of a free people selections are usually made by them from the different walks of life of men of high character and special fitness. There are two conceptions, or ideals, of constitution making, both of which are exemplified in the different states of the Union. One is that a constitution should be general in its provisions, that it ought not to descend into details, and never into the sphere of ordinary law making, and should leave each of the three great departments of government as much latitude as possible in exercising its functions. The other places upon the three departments many and minute limitations which experience has shown to be essential to good government. Our constitution is a conspicuous example of the second class. It has worked well in practice, and is a monument of the wisdom and patriotism of its framers, some of whom are still kept in the public service which they so auspiciously began more than a quarter of a century ago.

No product of the human mind, however, is perfect, and so the framers of our constitution provided in article 19 two ways of making changes in it. When

the convention in its address to the people said that liberal provision had been made, and frequent opportunities given, for amending. the constitution when experience and public policy may require it, they had in mind similar provisions in other constitutions upon that subject. In many of them the methods for a change were greatly restricted, and in some any proposal by way of an amendment had to be passed upon by at least two successive legislatures before the people were permitted to vote upon it; and so our constitution, in comparison with some others, may be frequently altered.—Jameson on Constitutional Conventions (4th ed.) § 551.

. Article 19, which is set out in full in the opinion of Mr. Justice Steele, relates to the subject of amendments, and the two methods therein presented are commonly called the convention, and the legislative method to which due attention will be given hereafter.

At the threshold of the case we are met by an argument advanced by some of the counsel for relator that the question as to the validity of this amendment is political and not judicial; that the only inquiry which the court is authorized to make is, (1)    Did the proposal receive the vote of two-thirds of all the members elected to each house?    (2)    Did a majority of the people at the election vote for its approval? If both requirements are met, further judicial inquiry ends.

This argument is inconsistent with the position taken by relator himself when he invoked the court's jurisdiction for the purpose of obtaining an adjudication as to the constitutionality of the amendment. That fact, however, is not conclusive against him, for consent cannot confer upon a court jurisdiction of a subject-matter with which it is not already vested.

The case relied on in support of this contention

is *Luther v. Borden*, 7 How. 1. Instead of being authority for, it is against, relator. That celebrated case, as stated by Taney, C. J., arose out of the unfortunate political differences which agitated the people of Rhode Island in 1841 and 1842, culminating in the Dorr rebellion. There were two rival state governments, each of which claimed to be legitimate. The controversy came before the supreme court of the United States, and, as stated in the syllabus of the opinion, it was held that the federal courts had not the power to try and determine which was the duly constituted government of a state, because, so far as the United States was concerned, this question belonged to the political, and not the judicial power; and, so far as the state was concerned, having been decided by the highest court of the state acting as a part of the government of the state, the federal courts were bound to follow its decision. It was further held that under the federal constitution and laws of congress the power to decide whether a government organized in a state is the duly constituted government of the state was vested by congress in the president, and after he has decided the question, the courts of the United States are bound to follow his decision. In the course of the opinion it was stated that the question which the plaintiff there proposed to raise was political and not judicial. By this was meant that, so far as the federal courts were concerned, it was political. The court observed, however, that, although the highest court of Rhode Island had decided in favor of what was called the Charter government, it was difficult to see how that question could be decided by the state judiciary if the existence of the court itself was in issue; for if the authority of that government under which the court was created should be annulled and overthrown, the power of its courts and other officers is annulled with it, and if the

state courts should enter upon the inquiry proposed in that case and come to the conclusion that the government under which it acted had been displaced by the opposing government, it would cease to be a court, and would be incapable of pronouncing a decision upon the point in trial.

It is clear that the questions there decided were entirely different from those here presented. The question here is not which of two rival state governments is legitimate, but whether or not a proposed amendment to the constitution of a state, whose government is conceded to be lawful and under which the court itself exists, has been legally adopted in accordance with the provisions of the recognized organic law.

*Nesbit v. The People,* 19 Colo. 441, is authority for the proposition that the question here presented is judicial, and within the jurisdiction of this court to determine. Indeed, most of the counsel for relator themselves concede it. In the Nesbit case this court assumed jurisdiction of a similar question, and although, under the particular facts of that case, it said that the question of the validity of the constitutional amendments there considered was practically removed from the sphere of mere judicial authority to the sphere of the political power of the state, the court, nevertheless, assumed jurisdiction and declared the amendments under consideration valid because repeated recognition thereof by all three departments, and long acquiescence therein by the people, impressed them with a validity which at first they did not possess. It was clearly stated, however, that at some stage, and in some circumstances, the question would be solely a judicial one, and the authorities expressly so declaring were referred to with approval. My understanding is that my associates agree with me that the questions before us are judi-

cial and not political, though in one of the opinions it is said that "in the main" they are judicial. It is distinctly stated, however, that the legislature cannot propose an amendment to the constitution not in substantial compliance with its provisions. Having, therefore, determined that the question is judicial and jurisdiction to try and determine it is vested in this court, I proceed to a consideration of the objections which are fatal to this amendment, and they may be thus stated:

(1) The journals of the two houses show that the same bill was not voted for by both bodies; (2) the proposal, though called "an amendment," contains at least two amendments which should have been separately submitted and voted on; (3) *quaere,* if the general assembly has the power to submit as an amendment new or additional articles to the constitution; (4) but if it has, article 20 amends more than six articles of the existing constitution in direct contravention of section 2 of article 19.

1. It was entirely competent for the general assembly in submitting this amendment to conform to the constitutional procedure prescribed for the passing of bills. It might, however, have done so by resolution or other appropriate proceeding. The method chosen was by bill, which was introduced in the senate by Senator Rush as "Senate Bill No. 2." The senate journal shows that the bill was amended in some particulars and an engrossed copy transmitted to the house.

When the senate's engrossed copy was received by the house, the bill was referred to as "Senate Bill No. 2" (printed house journal, p. 606). The next reference is on page 646, when the bill was read for the first time and referred to a committee as "S. B. No. 2." Thereafter it was reported back as "S. B. No. 2" to the committee of the whole (p. 664) and

then ordered placed on the calendar as "S. B. No. 2." On the 64th day of the session, the journal (pp. 707 and 708) shows that the house went into committee of the whole on "S. B. No. 2," and when it rose made the following recommendation:

"Mr. Speaker, Your committee of the whole beg leave to report they have had under consideration the following bill, in the course of which it was read at length, being the second reading thereof, and we make the following recommendations thereon:

"S. B. No. 2, by Senator Rush (as amended) * * * The committee of the whole recommend that the bill be referred to the committee on revision and constitution, be engrossed and placed on third reading and final passage."

And this report was adopted.

Under the rules bills are referred to the committee on revision to be put into proper form. That was done in this case and the committee reported it out, with the recommendation that it be placed on third reading (p. 723). On its final passage (p. 740) the bill was entered in full in the journal and designated as "S. B. No. 2 by Senator Rush (as amended)."

The bill as passed by the senate was entered in full on its journal, and as passed by the house what purports to be a like entry was made. The bill was enrolled and lodged in the office of the secretary of state. It was published in the Session Laws of 1901 and in the newspapers prior to election, as required by section 2 of article 19. The bill, as spread on the senate journal, does not correspond to the enrolled or published copy, and materially differs from the bill which the house journal shows was passed by the house. In that portion of section 3, which prolonged the official tenure of certain county officers of the former county of Arapahoe and constituted

27

them as officers of the new city and county of Denver, the five judges of the district court, the county judge and the district attorney of the former county were excluded from the bill which the senate passed, as its manuscript journal shows. The manuscript house journal and both printed journals show that the bill, as it passed the house, included those officers. That the difference between the two original journals and between these bills as passed by the respective houses is material, appears to me so plain that no argument is necessary to show it. As passed by the house the bill does, and as passed by the senate it does not make the district judges, the county judge and the district attorney officers of the new city and county of Denver. How is it possible to say that the two bills are the same?

That the respective manuscript journals on file with the secretary of state, as prepared by the officers of the general assembly charged with that duty exhibit this difference, is conceded. If we adhere to our previous decisions on this subject, this discrepancy is fatal to the validity of the submission. Section 2 of article 19 declares that the proposal for an amendment must be voted for by two-thirds of all the members elected to each house, and the amendment, as thus passed, must be "entered *in full* on their respective journals." If the senate passed one bill and the house another, then this amendment as enrolled and published was not voted for by two-thirds of all the members of each house. That the journals of the houses are the best evidence of what, in fact, those bodies did, and that they are conclusive, has been repeatedly ruled in this state.—*In re Roberts,* 5 Colo. 525; *Hughes v. Felton,* 11 Colo. 489; *Nesbit v. The People, supra; M. M. Life Ins Co. v. Colo. L. & T. Co.,* 20 Colo. 1, 5.

But by the majority opinion the established doc-

trine is practically ignored when it is said that other evidence than the journals satisfies them that the two houses passed the same bill. It is insisted that the enrolled bill is the highest evidence of what the two houses did. The enrolling of a bill is not required when the general assembly uses that vehicle in submitting amendments. In the Nesbit case, the practice was commended, but it was not thereby intended that an enrolled bill not commanded should be higher evidence of what in fact was enacted than the entry of the bill *in full* on the journals, which the constitution itself expressly says shall be done. But here the enrolled bill and the senate bill are not only different from the bill as printed in the newspapers, but different from the bill which the house journal shows was passed by that body.

Moreover, where, as under our constitution, a bill for an act of legislation must be enrolled and filed with the secretary of state, it is only *prima facie* evidence. If the journals contradict it, the journals control. *A fortiori,* where an enrolled bill is not required, but where its entry in full on the respective journals must be made, the latter is conclusive in case of conflict. But if we look to the entries of the house journal other than that which discloses the entry of the bill as passed, it is conclusive, to my mind, that the house made some amendments to the senate bill. That there is no direct statement therein that the house amended the bill, or that house amendments were returned to the senate for concurrence, is not significant in view of the fact that in proceedings of this sort no such entry is necessary; and if, as indicated in the opinion of my brother, Steele, the omission from the record that amendments were made is some evidence that the bill was not amended, though no such record is necessary, then the evidence that the bill was amended by the house is infinitely

stronger by the record which was made in the house journal, and which the constitution makes absolutely essential, from which it appears that the bill, as passed, materially differs from the engrossed bill sent over by the senate. Besides, the house journal shows that the bill was considered in committee of the whole, and when it emerged therefrom and was recommended for final passage, it was, for the first time, referred to as "S. B. No. 2 (as amended)," and thereafter received the same designation on the house journal. The house also ordered the bill engrossed. If it had not been amended, there was no necessity for that, for the senate copy was already engrossed. These facts are, to say the least, some evidence of amendment; especially significant is it that before that time the house journal described the bill as "S. B. No. 2."

The authorities of most of the states, including our own, are in accord with my conclusion: *Koehler v. Hill*, 60 Ia. 543; *Prohibitory Amendment Cases*, 24 Kas. 700; *State v. Tufly*, 19 Nev. 391; *State v. Brookhart*, 113 Ia. 250; *State v. Herried*, 10 S. Dak. 109.

The constitutions of Kansas, California, Iowa and Nevada provide that amendments "shall be entered on the journals." They do not say, as ours does, "in full." The supreme courts of California and Kansas say that an identifying reference in the journals is a sufficient compliance with this provision, while in Iowa and Nevada amendments must be entered in full.—*Prohibitory Amendment Cases, supra; Koehler v. Hill, supra; State v. Tufly, supra; Oakland Paving Co. v. Tompkins*, 72 Calif. 5.

That question, however, is beyond discussion in this state, for our constitution declares that the amendments must be "entered in full on their respective journals," and all the authorities agree, as shown by the able review in *State v. Herried, supra,*

that the only way to comply with such a provision is to do what the language commands, namely, enter correctly every material word of the amendment. That was not done in this case, if, as relator contends, the house passed the same bill as the senate. He ought not to be heard to say to the contrary, for the house journal, the best evidence, conclusively proves that, if it did, the entry of the amendment in full was not made. So that whether different bills were passed by the two houses, or the house failed to make the necessary entry of its doings, in either event the proposal of the amendment was fatally defective.

To say that the will of the people cannot be thwarted by the error of a journal clerk is an easy, but erroneous, way of evading the mandate of the constitution. Its framers knew that the journals are made up by clerks, and not members. And when the constitution said that amendments should be entered in full on the journals, the members of the assembly should see that the injunction is obeyed. If an error of a clerk is to be an excuse for disregarding mandatory provisions of the constitutions, they might as well be omitted.

2.   At the oral argument one of the learned counsel for relator made the startling assertion that when the general assembly called this submission "an amendment," that made it so, even though the court might readily conclude that it embraced a large number of separate and distinct amendments.  This cannot be the law.  If it were, then, by the same token, the general assembly might say that the vote of 18 out of a total of 35 members of the senate constitutes two-thirds of that body, or the canvassing board might say that less than one-half of the electors voting in favor of the proposal constitutes a majority. Whether this proposal was one amendment or several is strictly a judicial question.  A reference to the

history of municipal government in the city of Denver and of the controversy over its school districts will aid in determining whether this submission is one or more amendments.

For many years the city of Denver has existed under, and been governed by, a special charter granted by the legislature of the territory. This charter was saved in the schedule of the constitution, and has been frequently amended and revised by the general assembly. The city has always been regarded as a special subject of legislation, separate and distinct from municipalities organized under the general laws. Its inhabitants became dissatisfied with the management of local affairs by its own officers chosen as its special charter provided, and the general assembly was so importuned by them to protect the city against itself that the charter was amended in 1889 by empowering the governor to appoint a board of public works to have charge of all public improvements; and in 1891 the charter was again amended so as to vest in the governor power to appoint a fire and police board to have charge of the police and fire departments. It was supposed that these important departments would, to the city's good, be thus removed from local management and from local politics.

It was not long before the pendulum of public opinion began to swing the other way, and the demand for home rule became so pressing that the general assembly in 1901 submitted for the approval of the people the amendment which we are now considering, which, among other things, restores to the city of Denver complete control of its own municipal affairs, absolutely free from all constitutional restraint and from any supervision by the general assembly.

Within the same territory covered by the city of Denver there are several distinct and independent

school districts. District No. 1 was organized under
a special charter granted by the territorial legislature
in 1874, and it was also saved by the schedule. Dis-
tricts Nos. 2, 7, 11 and 21 are organized under the
general school laws. District No. 1 comprises that
portion of the city which was first laid out, and em-
braces the largest part of the business section, hav-
ing but a small school population, but a large amount
of valuable property. Repeated efforts have been
made by the other school districts, which comprise the
residence, and more remote, portions of the city hav-
ing a large school population, but a smaller amount of
taxable property, to effect a consolidation with dis-
trict No. 1, so as to equalize the burdens of taxation,
centralize school management, and save expense.
These attempts, which many people deemed worthy
of success, have always failed, the courts holding that
only by an amendment to the constitution could such
consolidation be effected; because the special charter
stood in the way.—*In re School Districts*, 26 Colo.
136; *In re Consolidation*, 23 Colo. 499.

In the light of the foregoing, we are better quali-
fied to determine the subjects of this proposal. Strict-
ly speaking, the scheme, or schemes, of government
furnished for the bodies politic mentioned therein are
not its subjects. Rather the subjects treated of are
the city of Denver, county of Arapahoe, cities of the
first and second class, and school districts. For our
present purpose, we may treat city and county to-
gether as constituting one subject. Still, it is ap-
parent that the city and school districts are, in their
nature and in law, distinct subjects. The city of
Denver, by the schedule of the constitution and uni-
formly by the general assembly and the courts, has
been treated as a separate subject of legislation.
School districts come under the general head of edu-
cation, to which article 9 of the constitution is ex-

clusively devoted, and the law-making power and the courts have recognized them as entirely distinct from all other public bodies corporate. That the city of Denver and the school districts are entirely distinct subjects is as clear as anything can be.

But suppose, as relator contends, that the subject, or object, of article 20 is the scheme, or schemes, of government therein provided. His counsel repeatedly assert that the only object of the amendment is to give home rule to Denver. They are strangely oblivious of the fact that section 7 disincorporates several existing school districts, consolidates the same territory into a new body politic, and names a temporary board of directors to manage it, until a new board is elected under the general school laws of the state, which thereafter shall apply. It is beyond dispute that at least two wholly distinct and dissimilar schemes are furnished. There is not a thing in common between the city of Denver and the school districts except that they occupy the same territory. Neither under the former laws nor in this proposal is the same, or a similar scheme of government provided for them. For the city of Denver, under article 20, the scheme of local government authorized is absolutely unfettered by the constitution, and wholly beyond the power of the general assembly to supervise. To the school district, as already stated, the general school laws apply, and they are always subject to change by the assembly. The new city and county and the new consolidated school district, and the scheme of government provided for each, are just as distinct as heretofore they have been. Hereafter a school board, to be selected as the general school laws provide, is to have charge of, and govern, the districts, while the city is to be under the control of an entirely separate and distinct authority, such as the charter may prescribe. Neither

body will have any more voice in the control of the other than one county has in the control of another county. It follows that in this proposal there are two separate subjects or objects. The scheme of government provided for them is entirely different. Neither is dependent on the other. One might wholly fail and the other be still complete in itself.

But what of all this? In the Nesbit case it was said that such a submission may, unlike a bill for an act, contain more than one subject. That was so then, and is so now. When the Nesbit case was decided there was no constitutional requirement that amendments containing more than one subject must be separately submitted, though that had been the uniform practice. But when this proposal was submitted, amended section 2 of article 19 expressly provided that when more than one amendment was submitted at any election, each of them shall be voted upon separately; and while such a submission may contain more than one subject without rendering it invalid, the true test as to whether they should be separately submitted so as to be separately voted upon is whether it contains one, or more than one, subject.

The proposal was submitted as one amendment. An elector living in school district No. 1 might want to vote for home rule for Denver, but against consolidating his school district with the outlying ones. On the other hand, a resident of the latter might want to vote for joining it to No. 1 so as to get the benefit of the increased values for purposes of taxation, but be strongly opposed to home rule for the city. Yet he must either vote for or against both propositions, though each is an independent subject, wholly disconnected with the other. The scheme of government for each is complete in itself, and the failure to adopt one in no sense interferes with the

other that is approved. This illustration shows the reason for the constitutional requirement.—*City of Denver v. Hayes,* 28 Colo. 110.

Three cases have been cited by both counsel, and, somewhat strangely, each side claims them as authority for its contention. These cases are: *State v. Timme,* 54 Wis. 318; *State v. Herried, supra; State ex rel. v. Secretary of State,* 43 La. Ann. 590. In the Timme case, the court said: "In order to constitute more than one amendment, the propositions submitted must relate to more than one subject, and have at least two distinct and separate purposes not dependent upon or connected with each other." In that case the object of the amendment under consideration was a change from annual to biennial sessions of the legislature, and dependent upon this, was the proposition to change the tenure of office of members of the assembly from one to two years, and the court held that these were not separate propositions; that to defeat or accomplish the one object both should be defeated, or both adopted, and therefore there was no necessity for submitting them as separate propositions. Yet the test there applied makes this submission clearly invalid; for, as we have seen, this amendment has at least two distinct objects, one to provide a scheme of home rule for Denver, the other to consolidate certain school districts within the same territory, and to furnish for the consolidated district a scheme of government entirely distinct and separate from that provided for the city of Denver.

In the Louisiana case the court held that the sole object of the amendment under consideration was to extend relator's lottery contract for a certain term of years, and that all the provisions and stipulations were merely elements of the consideration which the relator contracted to pay therefor. This case approved the test laid down by the Wisconsin court.

In the South Dakota case the same doctrine was recognized. The case most nearly in point is *State v. Powell,* 77 Miss. 543. The proposal there passed upon dealt with the supreme court, the circuit and chancery courts, the method of filling vacancies in the supreme court, and with circuit and chancery districts. The principal object was to change from an appointive to an elective system. Notwithstanding the fact that all these propositions related to the judicial department which were treated of in the same article of the constitution, the court held that each was a separate proposition, or subject, in itself, and that they should have been separately submitted.

The case is very instructive and is squarely authority for the conclusion which I have reached upon this branch. It has been criticised by counsel for relator with unpardonable severity. They have not attempted to point out the defective reasoning of the opinion, but content themselves merely with saying that the opinion of a court which passed upon the right of its own members to retain office is not entitled to any consideration. Learned counsel are in error, as a matter of fact, for the amendments in question which were held invalid did not interfere with the tenure of office of the judges of the court who pronounced the decision. It is not necessary for me to defend the integrity or ability of the supreme court of Mississippi. It is now, and has been, a very able court and beyond the breath of suspicion. The published opinion in this case is the best vindication of the ability of its members.

In my judgment this proposal contained at least two amendments, and they were not submitted separately, as the constitution imperatively requires, and therefore the submission was void.

3.   Whether the general assembly has power to

propose an amendment to the constitution by way of an added article may not be essential to the decision of this case; still I think it not authorized. It seems to be unquestioned that where a constitution does not contain express authority for calling a constitutional convention, the legislature may nevertheless do so, if there are no prohibitory words. But where no express authority is given for amending the constitution by the legislative method, that mode cannot be pursued.—Jameson on Constitutional Conventions (4 ed.) § 574h. The legislature in proposing an amendment for the approval of the people does not act in a legislative capacity, but as the representative, or agent, of the people whose will is expressed in the constitution by the convention that framed it. Being without authority to propose an amendment unless it is conferred by the constitution, when this authority is given to the legislature it is not as if it relates to an ordinary act of legislation. Rather is it a grant of, not a limitation upon, legislative power. Unless limited by the constitution, the legislative power of the legislature is plenary, but the proposal of a constitutional amendment not being the exercise of legislative power, but depending on a special grant, must be strictly construed, and the method prescribed in the grant is exclusive. Now, when our constitution says that the general assembly may propose any amendments to the constitution, and qualifies the grant by restricting the power to amendments of not more than six articles at any one session, amendments which are not germane, and specifically directed, to some existing article are not permissible. This legislative method was not intended to take the place of the constitutional method. Yet if relator is right, the general assembly might propose added articles *ad libitum*, by which, if approved, the existing constitution can be revised or wholly abrogated, and an

entirely new one adopted. I think the plain intention was, when the general assembly was given power to make proposals, to limit them to amendments which are germane, and specifically directed, to existing articles. Clearly if added articles are not such amendments to the constitution as are within the purview of article 19, then they are not such amendments as the general assembly may submit; for it is only such amendments as article 19 permits that the general assembly can propose.—*Livermore v. Waite,* 102 Calif. 113.

The analogy drawn from the practice of congress in submitting amendments to the federal constitution by way of added articles is misleading. The constitution of the United States is one of enumerated or delegated powers. The constitution of a state is an instrument of restraints or limitations on legislative power. This fundamental distinction is, of itself, a reason why different methods of amending may be employed.

But, as already intimated, I might, for the present purpose, concede that the general assembly may propose an amendment to the constitution by way of an added article, as well as by amendments that are strictly germane to existing articles. And this leads me to what I consider by far the most important of all the questions involved in the present controversy.

4. There is no serious denial that, if article 20 is now a part of the constitution, it amends more than six previously existing articles. Indeed, it is easily demonstrable that it radically amends or repeals at least ten, and probably sixteen. It would seem necessarily to follow that it is invalid, because in direct conflict with the inhibition found in the closing sentence of section 2 of article 19 against the proposal of amendments to more than six articles at the same session. How is this apparently inevitable conclusion

escaped? If I confess my inability to appreciate the reasoning by which my associates do it, it is not because I have not profound respect for their judgment. The logic of the situation is such that they were driven to the position they have taken, and the reasons which they have so forcibly given are the best and only ones that can be advanced. The scheme which the advocates of this measure had in mind could not be accomplished unless the limitations upon legislative power contained in ten or more articles of the constitution were removed. The supporters of the measure wanted to launch the entire scheme at one time, but as not more than six articles could be directly amended at the same session, this submission could not be effected by the legislative method which the constitution prescribed;—that is, amendments could not at the same session be proposed to enough articles to carry out the design. So the device was invented and a method employed, not recognized by the constitution, of adding an article which, though not mentioning a single existing article, contained provisions absolutely inconsistent, and in direct conflict, with the provisions of ten or more of them. That there should be no chance for controversy about the legislative intention, section 8 was added providing that: "Anything in the constitution of this state in conflict or inconsistent with the provisions of this amendment is hereby declared to be inapplicable to the matters and things by this amendment covered and provided for."

I venture to assert that this artifice—I do not say subterfuge—is easily pre-eminent as a palpable violation of the maxim that that which cannot be done directly cannot be done by indirection. But it is said, in the opinion of Mr. Justice Steele that the limitations of article 19 were intended to apply only to express, but not to implied amendments. This, too,

although it is accompanied by a statement that in our legislative method of proposing changes in the constitution there is no such thing as an implied amendment. In another place it is said that "implied amendments" is a convenient phrase used to indicate that rule of construction by which a later repugnant provision in a constitution or statute modifies or abrogates an earlier one. I assume, therefore, that what is meant when it is said that the inhibitions do not refer to implied amendments is, if an amendment to a constitution is made which does not expressly refer to an existing article, but merely modifies and abrogates it, by reason of the repugnancy of the later one, the general assembly may propose any number of them at the same session, though, if approved by the people, the effect is to repeal the whole existing constitution and adopt a new one. In the opinion of Mr. Justice Gabbert, the same result is reached, although stated in different language. His construction of article 20 is that because its main purpose is to provide a scheme of home rule for Denver, the changes which had to be made in the constitution to accomplish that result were merely incidential, and that incidental modifications which result from an appropriate direct amendment do not come within the constitutional limitations relating to the number of amendments which may be proposed at one session. In the brief of the attorney for relator who prepared the petition, which brief contains in clear and concise language every legitimate argument that can be advanced in support of the validity of this article, the same thought is thus expressed:

"The fact that an amendment contains some incidental provision which is in conflict with a provision of some other article does not constitute it an amendment of that article such as is contemplated in the constitutional prohibition against submitting amend-

ments to more than six articles at the same session of the legislature.''

Let us analyze this reasoning. Before there can be an amendment of any article by implication, there must be an express amendment of some particular article from which the amendment by implication arises. Before an incidental change can be brought about, some main thing must be directly amended of which the former is an incident. Article 20 does not specify any particular article or articles as being affected by it. Whatever changes in the existing constitution are thereby wrought are the result of affirmative and positive provisions found in article 20 that conflict with it, and do not result, as an implication, from some other change expressly made, or as a mere incident to a direct amendment of some principal thing. That which is incident to something else we correctly speak of as happening accidentally, or not in connection with the main design, as collateral or subordinate to, or contingent upon, the main design. Now these changes in ten or more articles are not of this sort. They are not collateral to such design. They are an essential and integral part of that design. It could not be effectuated unless such alterations were directly made. The framers of the constitution certainly knew the meaning of language. They knew that changes in laws may be made expressly, or by implication, and sometimes incidental amendments are made, that is, not designedly. And yet they said that ''amendments,'' without limiting them to express or direct, must not change more than six articles. The object was to prevent many changes at one time by the legislative method. The framers were not idly erecting a barrier against express amendments and deliberately opening the door to implied or incidental ones, which, like the convention method, could be employed to the utter overthrow of the constitution.

What shall we say of a strained construction that defeats the admitted purpose of the constitutional convention?

Certainly, it cannot be seriously contended that because the constitutional provisions abrogated as to the city and county of Denver remain in force throughout the state generally, that article 20 which has that result is not an amendment in the constitutional sense. The constitution is as effectually set aside, so far as it bears upon the city and county of Denver, as if it never applied. A constitutional amendment repealing the special charter of Denver, or that of school district No. 1 is an amendment, in the constitutional sense, though it relates to a body corporate within the limits of the state not coextensive with the state's boundaries.

It is a misuse of the word to say that the inhibitions of section 2 of article 19 are directed only against express or direct amendments, and not against implied or incidental ones. The interdiction contained in the last sentence of that section is against the proposal of something the effect of which may be to accomplish a forbidden result. That thing, if ratified by the people, ripens into an amendment. And if this amendment changes, in any way, expressly or by implication, directly or incidentally, more than six articles, it is absolutely void. This thing called an amendment may, it is true, expressly change, or only incidentally affect, existing articles; but, in the nature of things, it is impossible for the general assembly to propose an implied or incidental amendment. The very meaning of these terms presupposes an amendment expressd in words, or an express or direct amendment of some particular article from which the former is implied or to which the latter is incident. The inhibition goes against

the proposal of the "forbidden amendments," in whatever way they change existing articles.

Moreover, the amendments, which cannot change more than six articles, must be entered in full on the journals of the two houses. How can an implied or incidental amendment be spread upon the records? It is obvious that the thing prohibited is that which the general assembly clothes in language and puts into the form of a bill or resolution.

The fact that the amendment is by way of an added article does not avoid the limitation. An amendment by addition possesses no virtue not belonging to one directly amending an existing article. Both merely amend something, and both are amendments differently expressed. Complete revision of the constitution may be had by a constitutional convention. Changes less sweeping, and in fewer articles, are brought about by the legislative method of proposal; and it was thought wise not to permit proposals to more than six articles at a time. But the evident intent of the people is thwarted, and there is practically no difference between the constitutional and legislative method of amending the constitution if, by the simple device of adding an article and not mentioning therein existing articles, the limitations of article 19 are to be disregarded. If one article can thus be added, twenty or fifty can be made. This method is unknown to the constitution. Only two methods are prescribed by it. Its recognition here by the court is more than judicial legislation. It is, in effect, the usurpation by the judiciary of the power of making a constitution which is peculiarly a sovereign power of the people themselves. I say this because the court here validates an amendment which never had any life when proposed, and its ratification by the people did not breathe life into it, for it was proposed in direct violation of the limitation which the people

themselves had, in the constitution, placed on the legislative initiative.

One of my associates speaks of the legislative construction put upon the amendment we are now considering by twenty-one members of the assembly of 1901 who sat in the session of 1899 when the so-called Taylor amendment was submitted that raised the limit from one to six articles. If this is persuasive, what is to be said of the construction made by the same twenty-one members when, in 1899, they voted to submit the amendment which raised the limit? Is it to be supposed they did an idle or vain thing? Yet if the device proposed here succeeds, there was no necessity at all for submitting the Taylor amendment which conferred upon the general assembly power to propose amendments to six articles. Had the new invention of "implied or incidental" amendments been discovered when "express or direct" amendments were limited to one article, the nineteen existing articles could have been abrogated with as much ease and facility as ten can be now set aside after the raising of such limit. The argument proves too much. If because it is added and is silent as to existing articles and results only in an incidental or implied repeal article 20 is withdrawn from this particular limitation, it is also withdrawn from all the other limitations of article 19. It is saved here only because, as it is said, it is not the kind of amendment which is described in article 19. So far as I am able to determine, only one kind of amendment is mentioned therein.

If, however, article 20 is of the excepted class, not a single one of the limitations of article 19 apply, for they refer only to the amendments therein described. That being so, the general assembly might, in this way and by this artifice, make a valid pro-

posal, even though only a majority of the members of each house were in favor of it, and might declare that it should become effective even though less than a majority of the people voted for its approval. Should not such a construction be rejected? Is it not strange that my associates, instead of putting the decision of all the objections I have noted solely on the ground that the limitations invoked do not apply, labor to show that all but the one have been observed?

To sum up, it may be said that the general assembly has power to submit proposals for amendments to the constitution only such as come within the purview of article 9. If the general assembly proposes any of them, they are subject to the limitations of the grant which confers the power. If it proposes anything by way of an amendment that does not come within the purview of the limitations, it necessarily follows that the thing proposed is beyond the power of the general assembly to submit under any conditions whatever.

The cases cited from Illinois are not in point. In *Moore v. The People,* 106 Ill. 376, the court expressly said that provisions in articles of the constitution, other than the one directly amended, had no bearing upon the question under consideration, and I think the same could have been said in all of them. Neither in that nor in any of the other cases was the objection made that more than one article of the constitution had been amended at one session. In the speakership contest in our own court, the point was not even suggested. The fact that former submissions in our own state may be as faulty as this is no argument that this is valid. If all departments of government and the people have acquiesced in them for many years, they may be saved on that ground. Not a single case, however, has been cited by my associates or by counsel where the specific objection

here made was raised, and it is to be regarded as *res nova* in this jurisdiction.

Other objections to this amendment have been urged, among them that it contravenes certain parts of our national constitution. As Mr. Justice Steele thinks our own constitution has not been infringed, he has deemed it appropriate and incumbent upon him to pass upon the federal questions. Since, to my mind, the amendment is under the ban of our own constitution, in the particulars mentioned, there was no necessity for me to inquire if the higher law is violated, particularly as the discussion on my part would be purely academic and not binding on the federal courts.

Two arguments advanced by some of relator's counsel applicable to all the questions involved remain to be noted, if only to show their fallacy. We are told that five other separate and single amendments were submitted at the same election and that if article 20 is overthrown they fall with it. However disastrous that result might be, if we believe that article 20 is invalid we ought not to uphold it merely to protect the others. But in my judgment (while it is not my reason for so holding) the only way to sustain the others is to destroy this one. It confessedly amends more than six articles, and while my associates have saved it because it is added as a new article and does not (as they say) directly amend the articles which it abrogates, that saving power does not include the other five, because they specify the existing articles that are changed. So that when we come to count the number of articles which were amended at the one session, those affected by article 20, if it is upheld, are to be included, whereas if it is to be declared invalid as a submission, which I think should be done, the articles it affects are excluded, which leaves the other five standing.

Relator argues that the vote of the people approving this amendment cures all antecedent defects attending its submission, and should silence all opposition. No one is so rash as to deny that in this country a majority, in general, rules. But why is this so? As well said by Judge Jameson at section 568 of his valuable work on Constitutional Conventions, in the true sense of the term "the people" means the political society considered as a unit, comprising the entire population, of all ages, sexes and conditions. It is the right of the people, in this sense, to found institutions, and to determine how they shall, and how they shall not, be abolished or amended. Having ordained the mode in which changes therein may, and in which they may not, be made, clearly no mode can be legal which contravenes the express letter of that fundamental provision. The society has the physical power to override its own institutions, but that would be revolution. He further says:

"Nature knows nothing of any majority but that of force. Anterior, then, to any positive institutions, and this side an appeal to force, nothing less than the whole can rightfully bind the whole. It is only when a political society, with positive laws and compacts, has been established, that the whole can be bound by the action of a number less than the whole; and the number to which shall be accorded the power to act for the whole, and the conditions under which it may so act, are matters of positive regulation, in which alone they find their warrant. From this it is apparent, that a mere majority in number of all the citizens of a state, or of the electors of a state, have no right whatever to act for the whole state, unless they can point to authority to that effect, express or implied, in the constitution of the state; and that if the action taken or proposed by such majority is palpably in the

teeth of a constitutional provision, it is usurping and revolutionary.''

Let this doctrine, which no one challenges, be applied to the present situation. Article 20 was voted for by about 60,000 electors. Colorado has a population of about 600,000, and an electorate of nearly 200,000. This majority is potent only because made so by the constitution itself. We respect it only because we respect the constitution. But it is equally obligatory upon us to obey the other commands which the people have inserted in the same article of the constitution in which obedience to a number of the people less than the whole is enjoined. These commands have, as I have hereinbefore pointed out, been disobeyed, against which I enter an emphatic protest. It is my sincere conviction that, by the decision of the majority, positive mandates of the constitution have been entirely set aside in order to give effect to what is mistakenly supposed to be the constitutional will of a majority of the people. In this case, the voice of a constitutional majority expressed in accordance with the plain mandates of the constitution and in the constitutional manner pointed out in that instrument has not been expressed, and unless it has been, neither the courts nor private individuals owe allegiance to it.

The delicate and onerous task of the court has been lightened by learned counsel whose oral arguments and printed briefs have exhaustively presented the important questions involved. Special mention should be made of the assistance we have received from the able brief of Hon. Platt Rogers, which was undertaken at our request and to the preparation of which much time and thought were given. My brethren and I, in common with other officials of the state, have taken upon ourselves the solemn obligation to support the constitution of the United States and of

the state of Colorado, and to discharge the duties of our office according to the best of our ability. That such duty has been discharged by them I am as ready to concede as that it has been in my own case, though we differ in our judgment. If we do not observe such obligation, we not only violate our oaths, but are unfaithful to the trust reposed in us by the people of the state. Our first duty is to them, and we shall perform it according to the best of our understanding, without regard to what the effect may be upon us individually, either present or future. If the courts should ever become sufficiently weak to base their decisions upon public clamor, a desire to avoid criticism, or a wish to meet with public approval, instead of being actuated by the purpose to do justice, then are the people deprived of their constitutional right to have their causes determined by an impartial and disinterested tribunal. The foundation of our system of government is the constitution. If that is undermined, the structure must fall. The constitution is the work of the people; it declares their will, and those who disobey its provisions, instead of obeying the people, are in fact disregarding and defying their will.

In my judgment the temporary writ should be quashed and the proceedings dismissed, but as the majority of the court think the relief prayed for should be granted, the writ is made permanent.